**The COALITION FOR ECONOMIC EQUITY; California NAACP; Northern California NAACP; California Labor Federation; AFL–CIO; Council of Asian American Business Associations, California; Chinese American Citizens' Alliance; Women Construction Business Owners and Executives, California Chapter; United Minority Business Entrepreneurs; Chinese for Affirmative Action; Black Advocates in State Service; Asian Pacific American Labor Alliance; La Voz Chicana; Black Chamber of Commerce of California; Michele**

Bennett; Nancy Burns; Floyd Chavez; Christopher Clay; Dana Cunningham; Iran Celeste Davila; Shevade Dove, nfr Melodie Dove; Jessica Lopez; Virginia Mosqueda; Salvador Ochoa; Clifford Tong, Plaintiffs/Appellees,

v.

Pete WILSON, Governor; Daniel E. Lungren, Attorney General for the State of California; Joanne Corday Kozberg, Secretary of State and Consumer Services Agency and Cabinet Member; James Gomez, Dir., Dept. of Corr., Defendants/Appellants,

Californians Against Discrimination and Preferences, Inc., Defendant–Intervenor/Appellant.

Nos: 97–15030, 97–15031.

United States Court of Appeals, Ninth Circuit.

Argued Feb. 10, 1997.

Submission Deferred, and Submitted March 3, 1997.

Decided April 8, 1997.

As Amended on Denial of Rehearing and Rehearing En Banc Aug. 21, 1997.

Opinions Regarding Denial of Rehearing En Banc Aug. 28, 1997.

Daniel E. Lungren, Attorney General, Floyd D. Shimomura, Senior Assistant Attorney General, Linda A. Cabatic, Supervising Deputy Attorney General, Marsha A. Bedwell, Deputy Attorney General, Paul H. Dobson, Deputy Attorney General, Sacramento, CA, for defendants-appellants Pete Wilson, Governor, et al.

Michael A. Carvin, Charles J. Cooper, Michael W. Kirk, David H. Thompson, Cooper & Carvin, Washington, DC, Michael E. Rosman, Hans Bader, Center for Individual Rights, Washington, DC, and Manuel S. Klausner, Los Angeles, CA, for defendant-intervenor/appellant Californians Against Discrimination and Preferences, Inc.

Mark D. Rosenbaum, Daniel P. Takaji, ACLU Foundation of Southern California, Los Angeles, CA, Edward Chen, ACLU Foundation of Northern California, San Francisco, CA, and Evan H. Caminker, UCLA School of Law, Los Angeles, CA, for plaintiffs/appellees Coalition for Economic Equity, et al.

G. Scott Emblidge, Deputy City Attorney, San Francisco, CA, for defendants City and County of San Francisco and County of Marin.

Samuel R. Bagenstos, United States Department of Justice, Washington, DC, for amicus curiae United States.

Christine A. Littleton, UCLA School of Law, Los Angeles, CA, for amici curiae Ad Hoc Committee of University of California Faculty and Center for Constitutional Rights.

Alfred C. Pfeiffer, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, David

Benjamin Oppenheimer, Associate Professor of Law, Golden Gate University, San Francisco, CA, for amici curiae American Jewish Congress et al.

Pamela S. Karlan, University of Virginia School of Law, Charlottesville, VA, for amici curiae Alan Brownstein et al.

Tamu K. Sudduth, Morrison & Foerster, San Francisco, CA, for amici curiae A. Ruiz Construction Company and Associates, Inc., Chiang C.M. Construction, Inc., and Cresci Electric, Inc.

Jack D. Forbes, University of California, Davis, for amicus curiae Jack D. Forbes.

Sharon L. Browne, Pacific Legal Foundation, Sacramento, CA, for amici curiae Richard Hanlin, et al.

Theodore B. Olson, Gibson, Dunn & Crutcher, Washington, DC, for amicus curiae Independent Women's Forum.

Clint Bolick, Institute for Justice, Washington, DC, for amici curiae Institute for Justice et al.

G. Michael German, Law Offices of G. Michael German, San Francisco, CA, for amicus curiae Log Cabin Republicans of California.

Frank Wu, Howard University School of Law, Washington, DC, for amici curiae National Asian Pacific American Legal Consortium et al.

Kevin T. Snider, United States Justice Foundation, Escondido, CA, for amici curiae United States Justice Foundation et al.

Before: O'SCANNLAIN, LEAVY and KLEINFELD, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must decide whether a provision of the California Constitution prohibiting public race and gender preferences violates the Equal Protection Clause of the United States Constitution.

I

A

On November 5, 1996, the people of the State of California adopted the California Civil Rights Initiative as an amendment to their Constitution. The initiative, which appeared on the ballot as Proposition 209, provides in relevant part that

> [t]he state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.

Cal. Const. art. 1, § 31(a).[1]

The California Legislative Analyst's Office portrayed Proposition 209 to the voters as a measure that would eliminate public race-based and gender-based affirmative action programs. The California Ballot Pamphlet explained to voters that:

> A **YES** vote on [Proposition 209] means: The elimination of those affirmative action programs for women and minorities run by the state or local governments in the areas of public employment, contracting, and education that give "preferential treatment" on the basis of sex, race, color, ethnicity, or national origin.

> A **NO** vote on this measure means State and local government affirmative action programs would remain in effect to the extent they are permitted under the United States Constitution.

The Ballot Pamphlet also included arguments by proponents and opponents of Proposition 209. Proponents urged a "yes" vote, arguing that:

> A generation ago, we did it right. We passed civil rights laws to prohibit discrimination. But special interests hijacked the civil rights movement. Instead of equality, governments imposed quotas, preferences, and set-asides.

> . . . .

---

**1.** When we use the word "race," we refer also to color, ethnicity, and national origin.

And two wrongs don't make a right! Today, students are being rejected from public universities because of their RACE. Job applicants are turned away because their RACE does not meet some "goal" or "timetable." Contracts are awarded to high bidders because they are of the preferred RACE.

That's just plain wrong and unjust. Government should not discriminate. It must not give a job, a university admission, or a contract based on race or sex. Government must judge all people equally, without discrimination!

And, remember, Proposition 209 keeps in place all federal and state protections against discrimination!

Opponents of Proposition 209 urged a "no" vote, responding that:

California law currently allows tutoring, mentoring, outreach, recruitment, and counseling to help ensure equal opportunity for women and minorities. Proposition 209 will eliminate affirmative action programs like these that help achieve equal opportunity for women and minorities in public employment, education and contracting. Instead of reforming affirmative action to make it fair for everyone, Proposition 209 makes the current problem worse.

. . . .

The initiative's language is so broad and misleading that it eliminates equal opportunity programs including:

—tutoring and mentoring for minority and women students;

—affirmative action that encourages the hiring and promotion of qualified women and minorities;

—outreach and recruitment programs to encourage applicants for government jobs and contracts; and

—programs designed to encourage girls to study and pursue careers in math and science.

Proposition 209 passed by a margin of 54 to 46 percent; of nearly 9 million Californians casting ballots, 4,736,180 voted in favor of the initiative and 3,986,196 voted against it.

B

On the day after the election, November 6, 1996, several individuals and groups ("plaintiffs") claiming to represent the interests of racial minorities and women filed a complaint in the Northern District of California against several officials and political subdivisions of the State of California ("the State").[2] The complaint, brought under 42 U.S.C. § 1983, alleges that Proposition 209, first, denies racial minorities and women the equal protection of the laws guaranteed by the Fourteenth Amendment, and, second, is void under the Supremacy Clause because it conflicts with Titles VI and VII of the Civil Rights Act of 1964, and Title IX of the Educational Amendments of 1972. As relief, plaintiffs seek a declaration that Proposition 209 is unconstitutional and a permanent injunction enjoining the State from implementing and enforcing it.

With their complaint, plaintiffs filed an application for a temporary restraining order ("TRO") and a preliminary injunction. The district court entered a TRO on November 27, 1996, and granted a preliminary injunction on December 23, 1996.[3] The preliminary injunction enjoins the State, pending trial or final judgment, "from implementing or enforcing Proposition 209 insofar as said amendment to the Constitution of the State of California purports to prohibit or affect affirmative action programs in public employment, public education or public contracting." *Coalition for Econ. Equity v. Wilson*, 946 F.Supp. 1480, 1520–21 (N.D.Cal.1996).

---

**2.** When we refer to "the State," we mean, more specifically, Defendants/Appellants. Certain defendants did not appeal the preliminary injunction, including the City and County of San Francisco, the County of Marin, and Delaine Eastin, all of whom have filed briefs and papers in support of Plaintiffs/Appellees.

**3.** The district court also granted plaintiffs' motion provisionally to certify the plaintiff class on November 27, 1996, and their motion to certify the defendant class on December 16, 1996.

The district court provided extensive findings of fact and conclusions of law in support of the injunction. This lawsuit, the court explained, challenges Proposition 209's prohibition against race and gender preferences, not its prohibition against discrimination. Plaintiffs' constitutional challenge is "only to that slice of the initiative that now prohibits governmental entities at every level from taking voluntary action to remediate past and present discrimination through the use of constitutionally permissible race- and gender-conscious affirmative action programs." *Id.* at 1489.

The elimination of such programs, the district court found, would reduce opportunities in public contracting and employment for women and minorities. It further would cause enrollment of African–American, Latino, and American Indian students in public colleges to fall, though enrollment of Asian–American students would increase. Finally, the court found that minorities and women, to reinstate race-based or gender-based preferential treatment, would have to re-amend the California Constitution by initiative.

From these findings of fact the district court concluded, first, that plaintiffs have demonstrated a likelihood of success on their equal protection claim. Proposition 209, the court reasoned, has a racial and gender focus which imposes a substantial political burden on the interests of women and minorities. The court held that *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), and *Washington v. Seattle School District No. 1,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), prohibit such treatment of racial and gender issues in the political process.

The district court concluded, second, that plaintiffs have also demonstrated a likelihood of success on their pre-emption claims. Title VII, the court reasoned, preserves the discretion of public employers voluntarily to use race and gender preferences. To the extent that Proposition 209 bans such preferences statewide, the court held that Title VII preempts it under the Supremacy Clause.

The district court next explained that plaintiffs would suffer irreparable harm if Proposition 209 takes effect. If not enjoined, Proposition 209 immediately would ban existing preference programs in violation of plaintiffs' constitutional rights. The State, in contrast, the court concluded, would suffer little hardship from a preliminary injunction, which merely would suspend implementation of Proposition 209 pending trial.

Finally, the district court believed that a preliminary injunction would serve the public interest. Preserving the pre-election status quo would "harmonize" the public need for "clear guidance with respect to Proposition 209" with "the compelling interest in remedying discrimination that underlies existing constitutionally-permissible state-sponsored affirmative action programs threatened by Proposition 209." [4] *Coalition,* 946 F.Supp. at 1520.

### C

On December 31, 1996, Californians Against Discrimination and Preferences ("CADP"), the defendant/intervenor, applied to the district court for a stay of the preliminary injunction pending appeal. The State joined in the application. CADP and the State also filed notices of appeal to this court on January 3, 1997, and subsequently moved to stay the district court's injunction pending appeal pursuant to Federal Rule of Appellate Procedure 8. The district court entered its order declining to stay the injunction on February 7, 1997. On February 10, 1997, we

---

4. The district court deemed it "appropriate to waive the bond requirement" of Federal Rule of Civil Procedure 65(c) in this case. *Coalition,* 946 F.Supp. at 1521 n. 54. We need not address whether the district court erred by failing to require plaintiffs to post a bond in light of our conclusion on the merits. We note, however, that Rule 65(c) provides that "[n]o ... preliminary injunction shall issue except upon the giving of security by the applicant ... for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed. R.Civ.P. 65; *see generally New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351, 98 S.Ct. 359, 363, 54 L.Ed.2d 439 (1977) (Opinion of Rehnquist, Circuit Justice, granting stay of injunction) (noting "that any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury").

heard oral argument on the application to us for a stay. The parties' arguments for and against a stay pending appeal focused primarily on the merits underlying the preliminary injunction itself. We thus deferred submission of the stay application and expedited submission on the merits,[5] which we now decide.

## II

Before reaching the merits of the preliminary injunction, we pause to consider whether this case even belongs in federal court. No California state court has yet construed the meaning or effect of Proposition 209. Rather, plaintiffs ask a federal tribunal to enjoin flat-out this state constitutional amendment passed by a majority of the voters.[6] The district court remarked that the issue in this case is not "whether one judge can thwart the will of the people; rather, the issue is whether the challenged enactment complies with our Constitution and Bill of Rights." *Coalition*, 946 F.Supp. at 1490.

No doubt the district court is correct. Judges apply the law; they do not sua sponte thwart wills. If Proposition 209 affronts the federal Constitution—the Constitution which the people of the United States themselves ordained and established—the court merely reminds the people that they must govern themselves in accordance with principles of their own choosing. If, however, the court relies on an erroneous legal premise, the decision operates to thwart the will of the people in the most literal sense: What the people of California willed to do is frustrated on the basis of principles that the people of the United States neither ordained nor established. A system which permits one judge to block with the stroke of a pen what 4,736,180 state residents voted to enact as law tests the integrity of our constitutional democracy. These principles of judicial review are no less true today than in the days of *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803); *see, e.g., Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (*upholding* district court injunction against state-wide initiative measure).

■ The Supreme Court recently reminded federal judges that we should not even undertake to review the constitutionality of a state law without first asking: "Is this conflict really necessary?" *Arizonans for Official English v. Arizona,* —— U.S. ——, ——, 117 S.Ct. 1055, 1072, 137 L.Ed.2d 170 (1997). As a general rule, federal courts "ought not to consider the Constitutionality of a state statute in the absence of a controlling interpretation of its meaning and effect by the

**5.** The practice of this Circuit, made explicit in *Gregorio T. v. Wilson,* 54 F.3d 599 (9th Cir.1995), is that the panel to which a motion to stay or to expedite an appeal from a preliminary injunction is referred may retain jurisdiction over the merits of the appeal itself. The panel that decided *Gregorio T.* had been referred motions to stay, to consolidate, and to expedite appeals from a preliminary injunction against the implementation and enforcement of California voter initiative Proposition 187. The *Gregorio T.* panel, citing the priority and expedited decision that we must give appeals from preliminary injunctions under 28 U.S.C. § 1957 and Ninth Circuit Rule 3-3 (effective July 1, 1995), retained jurisdiction over the merits of the appeals. *Id.* at 600; *see Gregorio T. v. Wilson,* 59 F.3d 1002 (9th Cir.1995). Pursuant to *Gregorio T.,* we likewise retained jurisdiction over the merits of these appeals, which, similarly, challenge a preliminary injunction against the implementation and enforcement of a California voter initiative.

**6.** The district court concluded that plaintiffs have standing to bring this suit, which the State does not challenge on appeal. The court found (1) that Proposition 209 would injure plaintiffs by eliminating programs that benefit them; (2) that the injury would result from the State's enforcement of Proposition 209; and (3) that a declaration that Proposition 209 is unconstitutional and an injunction against its enforcement would redress the plaintiffs' alleged injuries. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Plaintiffs, conversely, argue that we must dismiss this appeal because under *Arizonans for Official English v. Arizona,* —— U.S. ——, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997), CADP had no standing to pursue a stay or an appeal. The Supreme Court expressed "grave doubts" in *Arizonans* whether the proponents of Arizona's "English only" initiative had "standing under Article III to pursue appellate review." *Id.* at ——, 117 S.Ct. at 1068. The issue, however, was one that the Court need not "definitively resolve" because the plaintiff herself lacked standing. We likewise need not definitively resolve this issue. Regardless of whether CADP has standing to appeal or seek a stay, there is no question that the State had standing to pursue both.

state courts." *Id.* (quoting *Poe v. Ullman,* 367 U.S. 497, 526, 81 S.Ct. 1752, 1768, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting)). Justice Ginsburg emphasized for a unanimous court that "[w]hen anticipatory relief is sought in federal court against a state statute, respect for the place of the States in our federal system calls for close consideration of that core question." *Id.* "Warnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a State's law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court." *Id.* at ——, 117 S.Ct. at 1074.

The ink on Proposition 209 was barely dry when plaintiffs filed this lawsuit. For this federal tribunal to tell the people of California that their one-day-old, never-applied-law violates the Constitution, we must have more than a vague inkling of what the law actually does. Plaintiffs challenge Proposition 209 to the extent that it eliminates "affirmative action." A California court that considered Proposition 209's pre-enactment ballot title and ballot label remarked that the term "affirmative action" is an "amorphous, value-laden term," "rarely defined so as to form a common base for intelligent discourse." *Lungren v. Superior Court,* 48 Cal.App.4th 435, 55 Cal.Rptr.2d 690, 694 (1996) (internal ellipses and citation omitted). "Most definitions of the term would include not only the conduct which Proposition 209 would ban, i.e., discrimination and preferential treatment, but also other efforts such as outreach programs." *Id.*

The district court properly limited its use of the term "affirmative action" to state pro-

grams that use race or gender classifications.[7] It enjoined Proposition 209 only to the extent that it eliminates programs that grant preferential treatment to individuals on the basis of their race or gender. The court cited as examples programs that would prefer contractors of a certain race or gender in the evaluation of bids for public contracts, programs that would prefer prospective employees of a certain race or gender for public employment, and programs that would prefer prospective students of a certain race or gender for public education or financial aid. Unlike in *Arizonans,* the State does not dispute that Proposition 209 operates to eliminate such programs.[8] Quite the contrary, the district court found that Defendant/Appellant Pete Wilson, Governor of California, issued an Executive Order on November 6, 1996, implementing Proposition 209 to do just that.

Without this factual basis, we would not hesitate to remand to the district court for reconsideration of the State's abstention motion in light of *Arizonans.* From the district court's findings, however, we are satisfied, to answer the Supreme Court's question, that "yes—this conflict really is necessary." We may now address the merits.

### III

■■ A preliminary injunction may issue "if the movant has shown either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions are raised and the balance of hardships tips sharply in the movant's favor." *Armstrong v. Mazurek,* 94 F.3d 566, 567 (9th Cir.1996) (citation omitted). We review an order granting a preliminary injunction for an abuse of discretion. *Los Angeles Mem'l Col-*

---

7. Plaintiffs apparently do not feel the same constraints. They argue, for example, that we must affirm the injunction because "[t]he remedy for intentional discrimination often calls for race-specific relief." *Coral Constr. Co. v. King County,* 941 F.2d 910, 920 (9th Cir.1991). But "race-specific relief" is hardly synonymous with "preferential treatment on the basis of race." A state may "eradicate racial discrimination" in many ways that do not involve racial preferences. When, for example, a state gives the *identified* victims of state discrimination jobs or contracts that were wrongly denied them, the beneficiaries

are not granted a preference "on the basis of their race" but on the basis that they have been individually wronged.

8. The district court denied the State's motion to abstain pursuant to *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), after the preliminary injunction issued because, among other things, the State did not dispute that Proposition 209 prohibits some race and gender preference programs.

*iseum Comm'n v. National Football League,* 634 F.2d 1197, 1200 (9th Cir.1980).

 An abuse of discretion occurs if the district court "bases its decision on an erroneous legal standard or on clearly erroneous findings of fact." *American–Arab Anti–Discrimination Comm. v. Reno,* 70 F.3d 1045, 1062 (9th Cir.1995) (citation omitted). We review the legal issues underlying a decision to grant an injunction de novo, as well as the conclusion that plaintiffs are likely to succeed on the merits of those issues.[9] *International Molders' and Allied Workers' Local Union No. 164 v. Nelson,* 799 F.2d 547, 551 (9th Cir.1986).

In granting the preliminary injunction, the district court first concluded that plaintiffs have demonstrated a likelihood of success on their claim that Proposition 209 violates the Equal Protection Clause of the Fourteenth Amendment. We must examine whether the district court's conclusion is based on an erroneous legal premise as a matter of "conventional" equal protection analysis, which looks to the substance of the law at issue, or as a matter of "political structure" equal protection analysis, which looks to the level of government at which the law was enacted. We shall apply each mode of analysis to Proposition 209 in turn.

## IV

 As a matter of "conventional" equal protection analysis, there is simply no doubt that Proposition 209 is constitutional. The Equal Protection Clause provides that "[n]o

State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The central purpose of the Equal Protection Clause "is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). The Fourteenth Amendment forbids such conduct on the principle that "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1943). Racial distinctions "threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." *Shaw v. Reno,* 509 U.S. 630, 643, 113 S.Ct. 2816, 2824, 125 L.Ed.2d 511 (1993) (citations omitted).

 The ultimate goal of the Equal Protection Clause is "to do away with all governmentally imposed discrimination based on race." *Palmore v. Sidoti,* 466 U.S. 429, 432, 104 S.Ct. 1879, 1881–82, 80 L.Ed.2d 421 (1984) (citation and footnote omitted). Therefore, "whenever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Adarand Constructors v. Pena,* 515 U.S. 200, 230, 115 S.Ct. 2097, 2114, 132 L.Ed.2d 158 (1995). The Equal Protection Clause also protects against classifications

---

9. Plaintiffs contend, as an initial matter, that we have no authority to review the "underlying merits" of the preliminary injunction that the district court entered. Plaintiffs are correct to the extent that we will not reverse a preliminary injunction just because we would have arrived at a different result if we had applied the law to the facts of the case. *Sports Form, Inc. v. United Press Int'l,* 686 F.2d 750, 752 (9th Cir.1982); *see also Associated Gen. Contractors of Cal. v. Coalition for Econ. Equity,* 950 F.2d 1401, 1419 (9th Cir.1991) (O'Scannlain, J. concurring) (pointing out that detailed discussion of statistical evidence to determine constitutionality is inappropriate to determine constitutionality on appellate review of preliminary injunction), *cert. denied,* 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992). Where, as here, however, the issue is whether the district court "misapprehended the law with re-

spect to the underlying issues in litigation," *Sports Form,* 686 F.2d at 752 (citations omitted), we assuredly may assess whether the district court got the law right. *See Glick v. McKay,* 937 F.2d 434, 436 (9th Cir.1991) (explaining that where facts established or of no controlling relevance, constitutional issue subject to "plenary" review); *Nelson,* 799 F.2d at 550 n. 1 (explaining that abuse of discretion will be found if district court "applied incorrect substantive law") (citation omitted).

The parties to this appeal dispute whether the district court relied on an erroneous legal standard, not whether the district court wrongly applied the right legal standard to the facts of the case. Where the issue is whether the district court got the law right in the first place, we do not defer review and thereby allow lawsuits to proceed on potentially erroneous legal premises.

based on gender. "Without equating gender classifications, for all purposes, to classifications based on race or national origin, the Court ... has carefully inspected official action that closes a door or denies opportunity to women (or to men)." *United States v. Virginia*, ―― U.S. ――, ――, 116 S.Ct. 2264, 2275, 135 L.Ed.2d 735 (1996) (internal footnote and citation omitted).

■■■ The standard of review under the Equal Protection Clause does not depend on the race or gender of those burdened or benefited by a particular classification. *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 494, 109 S.Ct. 706, 722, 102 L.Ed.2d 854 (1989) (plurality opinion). When the government prefers individuals on account of their race or gender, it correspondingly disadvantages individuals who fortuitously belong to another race or to the other gender. "Consistency *does* recognize that any individual suffers an injury when he or she is disadvantaged by the government because of his or her race." *Adarand*, 515 U.S. at 230, 115 S.Ct. at 2114. Proposition 209 amends the California Constitution simply to prohibit state discrimination against or preferential treatment to any person on account of race or gender. Plaintiffs charge that this ban on unequal treatment denies members of certain races and one gender equal protection of the laws. If merely stating this alleged equal protection violation does not suffice to refute it, the central tenet of the Equal Protection Clause teeters on the brink of incoherence.

■■■ The Equal Protection Clause guarantees that the government will not classify individuals on the basis of impermissible criteria. Most laws, of course—perhaps all—classify individuals one way or another. Individuals receive, or correspondingly are denied, governmental benefits on the basis of income, disability, veteran status, age, occupation and countless other grounds. Legislative classifications as a general rule are presumptively valid under the Equal Protection Clause. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254–

55, 87 L.Ed.2d 313 (1985). A legislative classification will deny equal protection only if it is not "rationally related to a legitimate state interest." *Id.* (citations omitted).

■■■ The general rule does not apply, however, when a law classifies individuals by race or gender. Any governmental action that classifies persons by race is presumptively unconstitutional and subject to the most exacting judicial scrutiny. *Adarand*, 515 U.S. at 230, 115 S.Ct. at 2114. To be constitutional, a racial classification, regardless of its purported motivation, must be narrowly tailored to serve a compelling governmental interest, an extraordinary justification. *See, e.g., Wygant v. Jackson Bd. of Ed.*, 476 U.S. 267, 277–78, 106 S.Ct. 1842, 1848–49, 90 L.Ed.2d 260 (1986) (plurality opinion). When the government classifies by gender, it must demonstrate that the classification is substantially related to an important governmental interest, requiring an "exceedingly persuasive" justification.[10] *Cleburne*, 473 U.S. at 441, 105 S.Ct. at 3255; *see Virginia*, ―― U.S. at ――, 116 S.Ct. at 2275.

■■■ The first step in determining whether a law violates the Equal Protection Clause is to identify the classification that it draws. Proposition 209 provides that the State of California shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race or gender. Rather than classifying individuals by race or gender, Proposition 209 *prohibits* the State from classifying individuals by race or gender. A law that prohibits the State from classifying individuals by race or gender *a fortiori* does not classify individuals by race or gender. Proposition 209's ban on race and gender preferences, as a matter of law and logic, does not violate the Equal Protection Clause in any conventional sense.

## V

■■■ As a matter of "political structure" analysis, however, plaintiffs challenge the level of government at which the State of

---

**10.** Proposition 209 contains a savings clause providing that "[n]othing in this section shall be interpreted as prohibiting bona fide qualifications based on sex which are reasonably neces-

sary to the normal operation of public employment, public education, or public contracting." Cal. Const. art. 1, § 31(c).

California has prohibited race and gender preferences. Plaintiffs contend, along with the United States as amicus curiae, that Proposition 209 imposes an unequal "political structure" that denies women and minorities a right to seek preferential treatment from the lowest level of government. The district court agreed, relying on the so-called "*Hunter*" doctrine.

### A

In *Hunter v. Erickson,* the Supreme Court addressed the constitutionality of an amendment to the Charter of the City of Akron, Ohio. Before the charter amendment was enacted, the Akron City Council had authority to pass ordinances regulating the real estate market. *Hunter,* 393 U.S. at 390, 89 S.Ct. at 560. Most ordinances became effective thirty days after the Council passed them. *Id.* The charter amendment operated to prevent the city council from enacting ordinances addressing racial discrimination in housing without majority approval of the Akron voters. *Id.* at 387, 89 S.Ct. at 558–59. The plaintiff, Nellie Hunter, who wanted a fair housing ordinance enforced, claimed that the amendment violated her right to equal protection of the laws.

The Supreme Court found in the charter amendment "an explicitly racial classification treating racial housing matters differently from other racial and housing matters." *Id.* at 389, 89 S.Ct. at 560. The law disadvantaged those who would benefit from laws barring racial discrimination in the real estate market as against those who would benefit from other regulations of the real estate market. *Id.* at 390–91, 89 S.Ct. at 560–61. Absent a compelling state interest, the state "may no more disadvantage any particular group by making it more difficult to enact legislation in its behalf than it may dilute any person's vote or give any group a smaller representation than another of comparable size." *Id* at 393, 89 S.Ct. at 561.

The Court later applied these principles to Washington State's educational decisionmaking structure in *Washington v. Seattle School District No. 1.* A statewide initiative in Washington barred school boards from assigning students beyond their neighborhood schools. The initiative contained several broad exceptions, which effectively operated to preclude only desegregative busing. *Seattle,* 458 U.S. at 462–63, 102 S.Ct. at 3190–91. Certain school districts challenged the initiative under the Equal Protection Clause. *Id.* at 464, 102 S.Ct. at 3191–92.

As in *Hunter,* the Court determined that the initiative effected a racial classification by removing "the authority to address a racial problem—and only a racial problem—from the existing decisionmaking body, in such a way as to burden minority interests." *Id.* at 474, 102 S.Ct. at 3197. The initiative had restructured the State's educational decisionmaking process to differentiate "between the treatment of problems involving racial matters and that afforded other problems in the same area." *Id.* at 480, 102 S.Ct. at 3200 (internal quotation marks and citation omitted). That differentiation burdened minority interests "by lodging decisionmaking authority over the question at a new and remote level of government." *Id.* at 483, 102 S.Ct. at 3202. Absent a compelling state interest, the initiative's unequal reordering of authority of school boards violated the Equal Protection Clause. *Id.* at 485–86, 102 S.Ct. at 3202–03.

The district court applied *Hunter* and *Seattle* to invalidate Proposition 209. Proposition 209, the court found, effected a race and gender classification by singling out race and gender preferences for unique political burdens. The court concluded that race and gender preferences, like antidiscrimination laws and integrative busing, are of special interest to minorities and women. Before Proposition 209 was enacted, the court reasoned, women and minorities could petition local government for preferential treatment. To obtain preferential treatment now, the court concluded, women and minorities must appeal to the statewide electorate, a "new and remote level of government."

The district court next analyzed whether the classifications it gleaned from Proposition 209 withstood "heightened scrutiny." The court concluded that the classifications served no important government interest, let alone a compelling one, thus denying women and minorities equal protection of the laws.

## B

The State contends that the district court's conclusion rests on an erroneous legal premise because Proposition 209, unlike the *Hunter* and *Seattle* initiatives, does not reallocate political authority in a discriminatory manner. CADP contends, additionally, that a majority of the electorate cannot restructure the political process to discriminate against itself. We address the second contention first.

### 1

Can a statewide ballot initiative deny equal protection to members of a group that constitutes a majority of the electorate that enacted it? Plaintiffs allege that Proposition 209 places procedural burdens in the path of women and minorities, who together constitute a majority of the California electorate. Is it possible for a majority of voters impermissibly to stack the political deck against itself? The Supreme Court leaves us, quite frankly, a little perplexed as to the answer.

The "political structure" equal protection cases, namely *Hunter* and *Seattle*, addressed the constitutionality of political obstructions that majorities had placed in the way of minorities to achieving protection against unequal treatment. *Hunter*, holding that the Akron amendment denied minorities equal protection of the laws, observed that "[t]he majority needs no protection against discrimination and if it did, a referendum might be bothersome but no more than that." *Hunter*, 393 U.S. at 391, 89 S.Ct. at 560. *Seattle* addressed a political structure held "to place special burdens on the ability of minority groups to achieve beneficial legislation." *Seattle*, 458 U.S. at 467, 102 S.Ct. at 3193. In *Romer v. Evans*, —— U.S. ——, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), the most recent "political structure" case, Colorado's Amendment 2 left homosexuals to "obtain specific protection against discrimination only by enlisting the citizenry of Colorado." *Id.* at ——, 116 S.Ct. at 1627. It would seem to make little sense to apply "political structure" equal protection principles where the group alleged to face special political burdens itself constitutes a majority of the electorate.

The difficulty, however, lies in reconciling what seems to be that eminently sensible conclusion with the principle that the Fourteenth Amendment guarantees equal protection to individuals and not to groups. That the Fourteenth Amendment affords individuals, not groups, the right to demand equal protection is a fundamental first principle of "conventional" equal protection jurisprudence. *Adarand*, 515 U.S. at 223–25, 115 S.Ct. at 2111. The Equal Protection Clause, after all, prohibits a state from denying "to any *person* within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1 (emphasis added).

Where a state denies someone a job, an education, or a seat on the bus because of her race or gender, the injury to that individual is clear. The person who wants to work, study, or ride but cannot because she is black or a woman ̇is denied equal protection. Where, as here, a state prohibits race or gender preferences at any level of government, the injury to any specific individual is utterly inscrutable. No one contends that individuals have a constitutional right to preferential treatment solely on the basis of their race or gender. Quite the contrary. What, then, is the personal injury that members of a group suffer when they cannot seek preferential treatment on the basis of their race or gender from local government? This question admits of no easy answer.

*Hunter* and *Seattle* suggest that the political structures they held unconstitutional imposed individual injuries analogous to "denying [members of a racial minority] the vote, on an equal basis with others." [11] *Seattle*, 458 U.S. at 470, 102 S.Ct. at 3195 (quoting *Hunter*, 393 U.S. at 391, 89 S.Ct. at 561). When the electorate votes up or down on a referendum alleged to burden a majority of the voters, it is hard to conceive how members of the majority have been denied the vote. If members of a majority somehow can

---

**11.** In the voting rights cases *Hunter* cited, *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and *Avery v. Midland Co.*, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968), each individual was denied his or her right to a vote of substantially equal weight to the vote of other residents.

deny their own right to ask local government for racial preferences, conceivably a statewide referendum *affording* preferential treatment to racial minorities would deny members of the racial majority the right to ask local governments to abolish racial preferences. "Consistency *does* recognize that any individual suffers an injury when he or she is disadvantaged by the government because of his or her race, whatever that race may be." *Adarand,* 515 U.S. at 230, 115 S.Ct. at 2114.

Thankfully, the absence of any specific findings by the district court in this regard relieves us from having to reconcile "the long line of cases understanding equal protection as a personal right," *Id.,* with *Hunter*'s admonition that "the majority needs no protection against discrimination," *Hunter,* 393 U.S. at 391, 89 S.Ct. at 560.[12] Our task in this case is merely to determine whether the district court relied on an erroneous legal premise. We accept without questioning the district court's findings that Proposition 209 burdens members of insular minorities within the majority that enacted it who otherwise would seek to obtain race-based and gender-based preferential treatment from local entities.[13] The legal question for us to decide is whether a burden on achieving race-based or gender-based preferential treatment can deny individuals equal protection of the laws.

12. This admonition seems to perceive the right to equal protection as a group right rather than an individual right, which the Supreme Court later denounced in *Croson* and *Adarand.* When we attribute equal protection rights to groups rather than to individuals, "[i]t reinforces the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls. We have rejected such perceptions elsewhere as impermissible racial stereotypes." *Shaw,* 509 U.S. at 647, 113 S.Ct. at 2827.

13. CADP's argument that *Hunter* and *Seattle* do not extend to gender-based laws because women themselves constitute a majority of the electorate is, nonetheless, compelling. Had the parties presented evidence, and had the district court found, that women constitute a majority of the California electorate, we likely would conclude as a matter of law, for that reason alone, that Proposition 209's ban on gender-based preferences does not deny women equal protection. By so

2

The Supreme Court has recognized an explicit distinction "between state action that discriminates on the basis of race and state action that addresses, in neutral fashion, race-related matters." *Crawford v. Board of Education of the City of Los Angeles,* 458 U.S. 527, 538, 102 S.Ct. 3211, 3218, 73 L.Ed.2d 948 (1982). The former denies persons against whom the law discriminates equal protection of the laws; the latter does not. Into which category Proposition 209 falls we must now determine.

In *Crawford,* the Supreme Court considered an amendment to the California Constitution that prohibited state courts from mandating pupil assignment or transportation except to remedy a specific equal protection violation. *Id.* at 532, 102 S.Ct. at 3215. Minority students had alleged that the amendment employed a racial classification that burdened minorities who sought to vindicate state-created rights. *Id.* at 536, 102 S.Ct. at 3217. The Supreme Court disagreed, holding that the amendment did not employ a racial classification. Unlike the charter amendment in *Hunter,* "the simple repeal or modification of desegregation or antidiscrimination laws, without more, never has been viewed as embodying a presumptively invalid

concluding, to be sure, we would bring to a head the tension between the protection that the "political structure" cases afford to the "ability of minority groups to achieve beneficial legislation," *Seattle,* 458 U.S. at 467, 102 S.Ct. at 3193, and the "fundamental principle of equal protection as a personal right." *Adarand,* 515 U.S. at 235, 115 S.Ct. at 2117. On the one hand, "[t]he majority needs no protection against discrimination," *Hunter,* 393 U.S. at 391, 89 S.Ct. at 560, but, on the other, the Equal Protection Clause protects the individual members of the majority, not the majority as a group. Caught in the crossfire of seemingly irreconcilable Supreme Court precedent, we would deem it better to err on the side of common sense. To hold that women as a majority could impose a political structure that denied themselves equal protection of the laws would subject to "political structure" scrutiny any state law that imposed benefits on those that shared a minority trait (e.g. veterans), with corresponding burdens on those that shared a majority trait (e.g. the non-veterans). Such a revolutionary concept is inimical to a constitutional scheme founded on democratic self-government.

racial classification." *Id.* at 539, 102 S.Ct. at 3218.

*Crawford,* thus, on the one hand, dictates that "the Equal Protection Clause is not violated by the mere repeal of race-related legislation or policies that were not required by the Federal Constitution in the first place." *Id.* at 538, 102 S.Ct. at 3218. *Hunter* and *Seattle,* on the other hand, prohibited states from placing decisionmaking authority over certain racial issues at higher levels of government.

Plaintiffs attempt to align Proposition 209 with *Hunter* and *Seattle* and distinguish it from *Crawford. Crawford,* they argue, addressed an amendment that merely repealed a benefit that the state itself had afforded, not the authority of local subdivisions to afford the same benefit. *Hunter* and *Seattle,* in their view, foreclose the authority of states to withdraw local jurisdiction to enact race and gender preferences unless the state also withdraws local jurisdiction to enact preferences based on any other criteria. Such an extraordinary proposition hardly follows from *Hunter* and *Seattle.*

### a

The *Hunter* doctrine "does not mean, of course, that every attempt to address a racial issue gives rise to an impermissible classification." *Seattle,* 458 U.S. at 485, 102 S.Ct. at 3203. Rather, for the doctrine to apply at all, the state somehow must reallocate political authority in a discriminatory manner.

States have "extraordinarily wide latitude ... in creating various types of political subdivisions and conferring authority upon them." *Holt Civic Club v. Tuscaloosa,* 439 U.S. 60, 71, 99 S.Ct. 383, 390, 58 L.Ed.2d 292 (1978).[14] That a law resolves an issue at a higher level of state government says nothing in and of itself. Every statewide policy has the "procedural" effect of denying someone an inconsistent outcome at the local level. "[A] lawmaking procedure that 'disadvan-

tages' a particular group does not always deny equal protection. Under any such holding, presumably a State would not be able to require referendums on any subject unless referendums were required on all, because they would always disadvantage some group." *James v. Valtierra,* 402 U.S. 137, 142, 91 S.Ct. 1331, 1334, 28 L.Ed.2d 678 (1971).

*Hunter* and *Seattle* relied expressly on the states' existing educational and housing decisionmaking processes to find that they had reallocated authority in a racially discriminatory manner. In *Hunter,* the state obstructed equal housing by removing only racially fair housing prerogatives from the lawmaking procedure for all other housing matters. In *Seattle,* the state obstructed equal education by removing only racially desegregative prerogatives from the lawmaking procedure for all other educational matters.

As the *Seattle* Court explained:

Before adoption of the initiative, the power to determine what programs would most appropriately fill a school district's educational needs—including programs involving student assignment and desegregation—was firmly committed to the local board's discretion. The question whether to provide an integrated learning environment rather than a system of neighborhood schools surely involved a decision of that sort. After passage of Initiative 350, authority over all but one of those areas remained in the hands of the local board. By placing power over desegregative busing at the state level, then, Initiative 350 plainly differentiates between the treatment of problems involving racial matters and that afforded other problems in the same area.

*Seattle,* 458 U.S. at 479–80, 102 S.Ct. at 3200 (internal quotation marks and citations omitted). Plaintiffs would have us extrapolate from *Seattle* that a state may never treat race *qua* race differently from any other

---

**14.** *See Williams v. Mayor,* 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015 (1933) ("A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its

creator."); *Hunter v. Pittsburgh,* 207 U.S. 161, 178, 28 S.Ct. 40, 46, 52 L.Ed. 151 (1907) ("The number, nature and duration of the powers conferred upon [municipal] corporations and the territory over which they shall be exercised rests in the absolute discretion of the State.").

legal classification. *Seattle* itself, however, declined that invitation.

The *Seattle* majority specifically allayed any concern that its holding rendered the state powerless to address racial issues where localities acted first. Justice Powell had lamented in dissent what a "strange notion" it was, "alien to our system—that local governmental bodies can forever preempt the ability of a State—the sovereign power—to address a matter of compelling concern to the State." *Id.* at 495, 102 S.Ct. at 3208 (Powell, J., dissenting). He questioned how a statewide repeal of busing created a racial classification when identical action by the local government would not. *Id.* at 494, 102 S.Ct. at 3207–08 (Powell, J., dissenting). To him, the decision left "unclear whether the State may set policy in any area of race relations where a local governmental body arguably has done 'more' than the Fourteenth Amendment requires." *Id.* at 498 n. 14, 102 S.Ct. at 3210 n. 14 (Powell, J., dissenting).

The majority responded that the "horribles paraded by the dissent" in footnote 14 were "entirely unrelated to this case." *Id.* at 480 n. 23, 102 S.Ct. at 3200 n. 23. The *Seattle* majority did not question "that the State might have vested all decisionmaking authority in itself." *Id.* at 477, 102 S.Ct. at 3198; *see id.* at 480 n. 23, 102 S.Ct. at 3200 n. 23. The State's prerogative in that regard was "irrelevant" in *Seattle*, though, because "the political structure it in fact erected impose[d] comparative burdens on minority interests . . . ." *Id.* at 477, 102 S.Ct. at 3198. The State, of course, "could have reserved to state officials the right to make all decisions in the areas of education and student assignment." *Id.* at 487, 102 S.Ct. at 3204. Conversely, the State had "not attempted to reserve to itself exclusive power to deal with racial issues generally." [15] *Id.* at 479 n. 22, 102 S.Ct. at 3200 n. 22. By removing desegregative prerogatives from these general grants of power, the State, as in *Hunter*, differentiated the treatment of racial problems in education from that afforded educational and racial issues generally.

When, in contrast, a state prohibits all its instruments from discriminating against or granting preferential treatment to anyone on the basis of race or gender, it has promulgated a law that addresses in neutral-fashion race-related and gender-related matters. It does not isolate race or gender antidiscrimination laws from any specific area over which the state has delegated authority to a local entity. Nor does it treat race and gender antidiscrimination laws in one area differently from race and gender antidiscrimination laws in another. Rather, it prohibits all race and gender preferences by state entities.

b

Even a state law that does restructure the political process can only deny equal protection if it burdens an individual's right to equal treatment.

■■ A denial of equal protection entails, at a minimum, a classification that treats individuals unequally. *See, e.g., Adarand,* 515 U.S. at 223–25, 115 S.Ct. at 2111. The "political structure" cases do not create some paradoxical exception to this *sine qua non* of any equal protection violation. In *Hunter*, the lawmaking procedure made it more difficult for Nellie Hunter to obtain protection against unequal treatment in the housing market. In *Seattle*, the lawmaking procedure made it more difficult for minority students to obtain protection against unequal treatment in education. [16] In *Romer*, Colora-

---

**15.** Rather, the State had given its municipalities "the power to enact antidiscrimination ordinances." *Seattle,* 458 U.S. at 479 n. 22, 102 S.Ct. at 3199 n. 22.

**16.** The district court perceived no relevant difference between the busing programs at issue in *Seattle* and the racial preference programs at issue here. We have recognized, however, that " 'stacked deck' programs [such as race-based 'affirmative action'] trench on Fourteenth Amendment values in ways that 'reshuffle' pro-

grams [such as school desegregation] do not." *Associated Gen. Contractors of Cal. v. San Francisco Unified Sch. Dist.,* 616 F.2d 1381, 1387 (9th Cir.), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980). Unlike racial preference programs, school desegregation programs are not inherently invidious, do not work wholly to the benefit of certain members of one group and correspondingly to the harm of certain members of another group, and do not deprive citizens of rights. *Id.*

do's Amendment 2 denied homosexuals the ability to obtain "protection against discrimination," thus classifying homosexuals "not to further a proper legislative end but to make them unequal to everyone else." *Romer,* —— U.S. at ——, 116 S.Ct. at 1629.

Plaintiffs challenge Proposition 209 not as an impediment to protection against unequal treatment but as an impediment to receiving preferential treatment. The controlling words, we must remember, are "equal" and "protection." Impediments to preferential treatment do not deny equal protection.[17] It is one thing to say that individuals have equal protection rights against political obstructions to equal treatment; it is quite another to say that individuals have equal protection rights against political obstructions to preferential treatment. While the Constitution protects against obstructions to equal treatment, it erects obstructions to preferential treatment by its own terms.

The alleged "equal protection" burden that Proposition 209 imposes on those who would seek race and gender preferences is a burden that the Constitution itself imposes. The Equal Protection Clause, parked at our most "distant and remote" level of government, singles out racial preferences for severe political burdens—it prohibits them in all but the most compelling circumstances. It is well-settled that "all governmental action based on race—a *group* classification long recognized as in most circumstances irrelevant and therefore prohibited—should be subject to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed." *Adarand,* 515 U.S. at 225, 115 S.Ct. at 2112–13 (internal quotation marks and citation omitted). That is because "there is simply no way of determining what classifications are 'benign' or 'remedial' and what classifications are in

fact motivated by illegitimate notions of racial inferiority or simple racial politics." *Id.* at 226, 115 S.Ct. at 2112 (quoting *Croson,* 488 U.S. at 493, 109 S.Ct. at 721, 102 L.Ed.2d 854 (1989) (plurality)). Rather, "any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Id.* at 224, 115 S.Ct. at 2111. A governmental action that classifies persons on the basis of gender demands an "exceedingly persuasive justification" to survive constitutional scrutiny. *Virginia,* —— U.S. at ——, 116 S.Ct. at 2275.

That the Constitution *permits* the rare race-based or gender-based preference hardly implies that the state cannot ban them altogether. States are free to make or not make any constitutionally permissible legislative classification. Nothing in the Constitution suggests the anomalous and bizarre result that preferences based on the most suspect and presumptively unconstitutional classifications—race and gender—must be readily available at the lowest level of government while preferences based on any other presumptively legitimate classification—such as wealth, age or disability—are at the mercy of statewide referenda.

After all, the "goal" of the Fourteenth Amendment, "to which the Nation continues to aspire," is "a political system in which race no longer matters." *Shaw,* 509 U.S. at 657, 113 S.Ct. at 2832. When the people enact a law that says race somehow matters, they must come forward with a compelling state interest to back it up. Plaintiffs would have us also require the people to come forward with a compelling state interest to justify a state law that says that race cannot matter in public contracting, employment, and edu-

---

17. We must be sure not to misread the district court's finding that those seeking race or gender preferences now must mount a statewide campaign while "those seeking preferences based on any ground other than race or gender, such as age, disability, or veteran status, continue to enjoy access to the political process at all levels of government." Proposition 209 only prohibits preferential treatment based on race or gender. "Those seeking preferences based on any ground other than race or gender, such as age, disability,

or veteran status," who "continue to enjoy access to the political process at all levels of government," include, we must remember, everyone—members of all races and both genders. If the state ever prohibited women and minorities from seeking preferences on a basis available to everyone else, such as age, disability, or veteran status, the state would violate Proposition 209's prohibition against race or gender discrimination.

cation. Plaintiffs' counsel went even one step further at oral argument. He urged that "[t]he people of the State of California are not entitled to make a judgment as to whether compelling state interests have been vindicated. That is for the courts." *Au contraire!* That most certainly *is* for the people of California to decide, *not* the courts. Our authority in this area is limited to deciding whether the interests proffered by the people are sufficient to justify a law that classifies among individuals. If the federal courts were to decide what the interests of the people are in the first place, judicial power would trump self-government as the general rule of our constitutional democracy.

■■ The Constitution permits the people to grant a narrowly tailored racial preference only if they come forward with a compelling interest to back it up. *See, e.g., Adarand,* 515 U.S. at 229–31, 115 S.Ct. at 2114. "[I]n the context of a Fourteenth Amendment challenge, courts must bear in mind the difference between what the law permits, and what it requires." *Shaw,* 509 U.S. at 654, 113 S.Ct. at 2830. To hold that a democratically enacted affirmative action program is constitutionally permissible because the people have demonstrated a compelling state interest is hardly to hold that the program is constitutionally required. The Fourteenth Amendment, lest we lose sight of the forest for the trees, does not require what it barely permits.

A state law that prohibits classifications based on race or gender is a law that addresses in neutral-fashion race-related and gender-related matters. As in *Crawford,* "[i]t would be paradoxical to conclude that by adopting the Equal Protection Clause of the

Fourteenth Amendment, the voters of the State thereby had violated it." [18] *Crawford,* 458 U.S. at 535, 102 S.Ct. at 3217. For these reasons, we are persuaded that the district court relied on an erroneous legal premise when it concluded that plaintiffs have demonstrated a likelihood of success on their equal protection claim.

## VI

The district court also concluded that plaintiffs have demonstrated a likelihood of success on their claim that Proposition 209 is invalid under the Supremacy Clause because Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq,* pre-empts it.[19] The district court found Title VII to be "silent" on "the role of voluntary race- and gender-conscious affirmative action" under its schema. It thus turned, pursuant to *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to an interpretation of the statute by the Equal Employment Opportunity Commission ("EEOC"). An EEOC Guideline states: "Voluntary affirmative action to improve opportunities for minorities and women must be encouraged and protected in order to carry out the Congressional intent embodied in title VII." 29 C.F.R. § 1608.1(c). Applying *Chevron,* the court gave "substantial deference" to this interpretation of the statute.

■■ The district court is correct that federal law may pre-empt state law to the extent that the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).[20]

---

**18.** To the extent that Proposition 209 prohibits race and gender preferences to a greater degree than the Equal Protection Clause, it provides greater protection to members of the gender and races otherwise burdened by the preference. *See PruneYard Shopping Ctr. v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 2040, 64 L.Ed.2d 741 (1980) (noting a state's "sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution").

**19.** The district court also found that Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et*

*seq.,* and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, did not pre-empt it. Plaintiffs do not contend otherwise on appeal.

**20.** Plaintiffs raise no claim of field pre-emption, which, as the district court noted, does not apply. The district court also rejected plaintiffs pre-emption claim on the ground that "compliance with both federal and state regulation is a physical impossibility." *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963).

The district court apparently overlooked, however, the express pre-emption provisions of the 1964 Civil Rights Act.[21] "In two sections of the 1964 Civil Rights Act, §§ 708 and 1104, Congress has indicated that state laws will be pre-empted only if they actually conflict with federal law." *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 281, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987) (plurality opinion).

Section 708 of Title VII provides:

Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present of future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter.

42 U.S.C. § 2000e–7. That is all Title VII pre-empts. Proposition 209 does not remotely purport to require the doing of any act which would be an unlawful employment practice under Title VII. Quite the contrary, "[d]iscriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Title VII, therefore, does not pre-empt Proposition 209.

Section 1104 of Title XI also generally limits the pre-emptive effect of all titles of the Civil Rights Act:

Nothing contained in any title of this Act shall be construed as indicating an intent on the part of Congress to occupy the field in which any such title operates to the exclusion of State laws on the same subject matter, nor shall any provision of this Act be construed as invalidating any provision of State law unless such provision is inconsistent with any of the purposes of this Act, or any provision thereof.

42 U.S.C. § 2000h–4.

Section 1104's more general pre-emption provisions would operate to pre-empt Proposition 209 only if Proposition 209 were inconsistent with any purpose or provision of the 1964 Civil Rights Act. Title VII's one command regarding race and gender preferences conclusively demonstrates that Proposition 209 is entirely consistent: "Nothing contained in this subchapter shall be interpreted to require any [entity] ... subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group...." 42 U.S.C. § 2000e–2(j); *see Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 259, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981) ("Title VII ... does not demand that an employer give preferential treatment to minorities or women."). Nothing in Title VII suggests that Congress intended to leave government with less latitude under Title VII than private employers. *Local No. 93, Int'l Ass'n of Firefighters v. Cleveland*, 478 U.S. 501, 520 n. 10, 106 S.Ct. 3063, 3074 n. 10, 92 L.Ed.2d 405 (1986).

Because Title VII by its plain language does not pre-empt Proposition 209, the district court relied on an erroneous legal premise in concluding that plaintiffs are likely to succeed on the merits of their pre-emption claims. ·

## VII

With no likelihood of success on the merits of their equal protection or pre-emption claims, plaintiffs are not entitled to a preliminary injunction. The district court determined that plaintiffs had demonstrated irreparable harm because Proposition 209 threatened to inflict an immediate and ongoing constitutional injury upon them. That conclusion, for reasons we have explained, rests on an erroneous legal premise. As we explained in *Glick v. McKay*, 937 F.2d 434 (9th Cir.1991), our review of a constitutional issue is plenary where "the facts are established or of no controlling relevance." *Id.* at 436 (quoting *Thornburgh v. American College of Obstetricians & Gynecologists*, 476 U.S. 747, 757, 106 S.Ct. 2169, 2177, 90 L.Ed.2d 779 (1986)). Assuming all facts alleged in the complaint and found by the district court to be true, and drawing all

---

21. In light of the express pre-emption provisions and plain language of Title VII, we do not reach the question of whether EEOC guidelines, as opposed to regulations, merit *Chevron* deference.

reasonable inferences in plaintiffs' favor, we must conclude that, as a matter of law, Proposition 209 does not violate the United States Constitution. With no constitutional injury on the merits as a matter of law, there is no threat of irreparable injury or hardship to tip the balance in plaintiffs' favor.

For the foregoing reasons, we vacate the preliminary injunction, deny the motion to stay the injunction as moot, and remand to district court for further proceedings consistent with this opinion.

Preliminary injunction **VACATED;** stay **DENIED** as moot; **REMANDED.**

## ORDER

Aug. 21, 1997

The Opinion filed on April 8, 1997, is amended as follows:

With these amendments, the panel has voted to deny Plaintiffs/Appellees' petition for rehearing and to reject the suggestion for rehearing en banc.

The motion of Mary Francis Berry, A. Leon Higginbotham, Yvonne Y. Lee and Cruz Reynoso for leave to file a letter brief joining in the request for rehearing en banc is DENIED as moot.

The full court was advised of the suggestion for rehearing en banc. An active judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed.R.App.P. 35.

The petition for rehearing is denied and the suggestion for rehearing en banc is rejected.

Before: O'SCANNLAIN, LEAVY and KLEINFELD, Circuit Judges.

## ORDER

Aug. 28, 1997

The clerk is directed to issue the mandate pursuant to Fed. R.App. P. 41(a).

The order filed August 21, 1997, rejecting the suggestion for rehearing en banc is amended to include the dissent from the denial of rehearing en banc of Judge Schroeder, in which Judge Pregerson, Judge Norris and Judge Tashima concur, the opinion of Judge Norris respecting the denial of rehearing en banc, in which Judge Schroeder, Judge Pregerson and Judge Tashima concur, and the opinion of Judge Hawkins commenting on the denial of rehearing en banc. Judge Reinhardt was recused from this case and did not participate in the proceedings.

SCHROEDER, Circuit Judge, with whom PREGERSON, NORRIS and TASHIMA, Circuit Judges, join, dissenting from denial of rehearing en banc.

I respectfully dissent from the court's decision not to review this case *en banc. En banc* review was warranted in this case for two reasons.

First, the case is extraordinarily important. In upholding the constitutionality of California Proposition 209, which forbids the state to offer any preferential treatment in employment, education, or contracting on the basis of race or gender, the case has put equal protection law in a state of turmoil. At stake is whether the voters may bar the state's institutions from using narrowly tailored race- or gender-based remedies which serve compelling state interests, including redressing the effects of past racial and gender-based *discrimination* by those very institutions.

Second, the decision is contrary to controlling Supreme Court precedent. Proposition 209 puts only race- or gender-based remedies for past discrimination, and no other state preferences, beyond the reach of the legislative or any other process, save another state initiative. The Supreme Court has squarely held that a state violates the Constitution when it attempts to put legislative remedies which benefit minorities at a remote level of government beyond the ordinary legislative process. *See Washington v. Seattle School District, No. 1,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982); *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969).

The panel opinion, *Coalition for Economic Equity v. Wilson*, 110 F.3d 1431 (9th Cir. 1997) (*"CEE II"*), treats the case as if the state were merely repealing past remedies that it had determined were not constitutionally required. *See id.* at 1443 (citing *Crawford v. Board of Educ.*, 458 U.S. 527, 538, 102 S.Ct. 3211, 3218, 73 L.Ed.2d 948 (1982)). Proposition 209, however, is not merely a repeal of past remedies; it is a bar to future remedies to curb injustice. *See Coalition for Economic Equity v. Wilson*, 946 F.Supp. 1480, 1508 (N.D.Cal.1996) (*"CEE I"*) ("Proposition 209, by its terms, not only repeals all existing state and local affirmative action programs, but also prohibits the adoption of such programs in the future. In so doing, Proposition 209 displaces authority with respect to a race and gender issue to 'a new and remote level of government,' and thus reorders the political process to the detriment of women and minorities.") (quoting *Seattle Sch. Dist.*, 458 U.S. at 483, 102 S.Ct. at 3202).

The panel is also incorrect when it characterizes the ordinance as "adopting the Equal Protection Clause." *CEE II*, 110 F.3d at 1446 (quoting *Crawford*, 458 U.S. at 535, 102 S.Ct. at 3217). Unlike the amendment in *Crawford*, Prop. 209 does not merely conform California law to the federal constitution. *See Crawford*, 458 U.S. at 535, 102 S.Ct. at 3217. Rather, it is specifically designed to bar remedies that are permissible under the Equal Protection Clause. *See CEE I*, 946 F.Supp. at 1489. Otherwise, the Proposition would be a nullity. *See id.*

The concept of judicial review is a constitutional check on the excesses of majority rule. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 175–77, 2 L.Ed. 60 (1803); The Federalist No. 78 (Hamilton), at 466–70 (Clinton Rossiter ed., 1961). The responsible exercise of judicial review requires courage and vigilance. I would affirm District Judge Henderson's fine opinion in *CEE I*.

NORRIS, Circuit Judge, with whom SCHROEDER, PREGERSON and TASHIMA, Circuit Judges, join, respecting the denial of rehearing en banc.

In *Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), Justice John Harlan stated a constitutional principle for the protection of racial minorities from discriminatory treatment within the political process. Justice Harlan wrote that "a provision that has the clear purpose of making it more difficult for racial ... minorities to achieve legislation that is in their interest ... is discriminatory on its face." *Id.* at 395, 89 S.Ct. at 563 (Harlan, J., concurring). In *Washington v. Seattle School District No. 1*, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), the full Court adopted Justice Harlan's reasoning, holding that whenever the state "differentiates between the treatment of problems involving racial matters and that afforded other problems in the same area [of government]," it has utilized an impermissible "racial classification" in restructuring the political process. *Id.* at 470, 480, 102 S.Ct. at 3195, 3200 (citing Justice Harlan's *Hunter* concurrence). It is the core holding of these cases that the state may not "place special burdens on the ability of minority groups to achieve beneficial legislation ... by lodging decisionmaking authority over the question at a new and remote level of government." *Id.* at 467, 483, 102 S.Ct. at 3193, 3202. Because that is precisely what Proposition 209 does, our court has no legitimate choice but to declare it unconstitutional. Unless and until the Supreme Court overrules *Hunter* and *Seattle*, California simply does not have the constitutional authority to place minority groups at a disadvantage in the political process.

Proposition 209 strips the state legislature and all political subdivisions such as city councils, county boards of supervisors, local school boards, and the Board of Regents of the University of California, of all authority to adopt racial preferences in the future. It "lodg[es] decisionmaking authority over [affirmative action] at a new and remote level of government"—the entire electorate of California. The measure thereby deprives the proponents of affirmative action—and only the proponents of affirmative action—of the ordinary benefits of representative government. The AARP can go to a city council tomorrow and request special incentives to attract older Americans to the municipal

workforce; the VFW can lobby the state legislature for special employment or housing incentives on behalf of veterans; Marian Wright Edelman can lobby for preferential health benefits for children at all levels of state and local government. Advocates of racial preferences, in contrast, may no longer appeal to a city council or the Board of Regents, or even to the state legislature. They must take their case directly to the voters of California.

It is hard to imagine a more onerous burden in the political process than mounting a statewide initiative campaign. As the district court recognized, "substantial funds are required to organize and fund the statewide campaign" that is necessary to get an initiative passed. *See Coalition for Economic Equity v. Wilson,* 946 F.Supp. 1480, 1498–99 (N.D.Cal.1996). California has a population of some thirty-two million people. The cost of delivering a message to that entire electorate is staggering. The Proposition 209 campaign itself cost over three million dollars, with most of the funds going to "television, radio, print advertising, and direct mail." *Id.* Proposition 209 now places that obstruction before every effort to enact affirmative action programs. It effectively shuts off all debate over racial preferences in the halls of representative government, depriving minorities even of the *opportunity* to persuade their elected and appointed officials that affirmative action programs make sense as a matter of social policy when they are narrowly tailored to achieve compelling remedial objectives.[1]

The *Coalition* panel does not dispute that affirmative action programs confer benefits primarily upon minorities, nor does it dispute that Proposition 209 places special obstacles in the way of those programs. "We accept without question," the panel writes, "the district court's findings that Proposition 209 burdens members of insular minorities within the majority that enacted it who otherwise would seek to obtain race-based and gender-based preferential treatment from local entities." *Coalition for Economic Equity v. Wilson* [*CEE v. Wilson* ], 110 F.3d 1431, 1442 (9th Cir.1997). Notwithstanding its recognition that Proposition 209 places special burdens on minority groups in the political process, the panel holds that the measure is constitutional. It reaches this result, I submit, in violation of its duty to follow controlling Supreme Court precedent.

I

The panel justifies its result by drawing a distinction between affirmative action programs and antidiscrimination laws that has no place in *Hunter–Seattle* analysis. It rationalizes this by characterizing all affirmative action programs as inherently discriminatory—even those that pass constitutional muster under the Fourteenth Amendment. The Equal Protection Clause is aimed at securing equality, the panel complains, and so affirmative action programs are not worthy of protection under the *Hunter–Seattle* doctrine because—in the panel's opinion—they do not secure "equal treatment." *CEE v. Wilson,* 110 F.3d at 1445. The panel uses its distinction to argue that *Hunter* and *Seattle* are categorically inapplicable to race-based preferences, and, in doing so, ignores the Supreme Court's clear mandate that *Hunter* and *Seattle* shall apply to *all* constitutional legislation that "inures primarily to the benefit of the minority." *Seattle,* 458 U.S. at 472, 102 S.Ct. at 3196.

In resting its decision on the view that affirmative action programs do not secure "equality," the panel injects into *Hunter–Seattle* analysis a test that looks to the personal views of individual judges about the relative merits of affirmative action programs and antidiscrimination laws. There is absolutely no reason to believe that the Su-

---

1. As the Supreme Court has made clear, a race-based preference program may be a constitutional means of remedying discrimination.

 The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and the government is not disqualified from acting in response to it.... When race-based action is necessary to further a compelling interest, such action is within constitutional constraints if it satisfies the 'narrow tailoring' test this Court has set out in previous cases.

 *Adarand Constructors v. Pena,* 515 U.S. 200, 237, 115 S.Ct. 2097, 2118, 132 L.Ed.2d 158 (1995).

preme Court intended any such result. The relevant inquiry under *Hunter* and *Seattle* is simply to ask whether legislation is *beneficial to minorities. See Hunter*, 393 U.S. at 392–93, 89 S.Ct. at 561–62; *id.* at 395, 89 S.Ct. at 563 (Harlan, J., concurring); *Seattle*, 458 U.S. at 472, 102 S.Ct. at 3196. The Court used language that is broad and unqualified. Nowhere has the Court suggested that the *Hunter–Seattle* doctrine permits judges to rely upon their own subjective impressions as to whether a particular measure aimed at benefiting minorities is also an effective means of securing equality, or whether the social costs associated with that measure are worth the potential benefits.

Indeed, the panel's distinction between antidiscrimination laws and race-based remedial programs is squarely rejected by *Seattle*. There, the Court followed *Hunter* in striking down a Washington statute that forbade local school districts from using busing to remedy de facto school segregation. Of course, the very busing program that gave rise to the case was itself a controversial, race-based remedial program. Under the Seattle busing plan, students were assigned to schools—and bussed accordingly—on the basis of their race. *See Seattle*, 458 U.S. at 461, 473–74, 102 S.Ct. at 3190, 3196–97. The *Seattle* Court held that this race-based remedial program was entitled to the same constitutional protection that the *Hunter* Court afforded to antidiscrimination laws. Both types of law were "beneficial" to minorities, and both held a common goal: to "overcome the 'special condition' of prejudice" and remedy the injustices that have resulted from slavery and its legacy, racial discrimination. *See Seattle*, 458 U.S. at 486, 102 S.Ct. at 3203 (*quoting U.S. v. Carolene Prods.*, 304 U.S. 144, 153 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938)). The Court further held that the political controversy that enveloped the Seattle busing plan was not a proper factor for a court to consider in rendering a constitutional decision. Rather, it instructed, "in the absence of a constitutional violation, the desirability and efficacy of school desegregation are matters to be resolved through the political process. *For present purposes, it is enough that minorities may consider busing for integration to be 'legislation that is in their interest.'* " *Seattle*, 458 U.S. at 474, 102 S.Ct. at 3197 (quoting Justice Harlan's concurrence in *Hunter*) (emphasis added).

The panel's distinction, in contrast, has the effect of transforming constitutional analysis into an arena for political debate over the "desirability and efficacy" of affirmative action. The panel "distinguishes" affirmative action programs, even though the panel agrees that such programs constitute legislation that is beneficial to minorities, because it thinks that affirmative action does not in fact promote "equality." It deploys the full rhetorical arsenal developed by the opponents of affirmative action, characterizing such programs as "inherently invidious" instances of reverse discrimination, *CEE v. Wilson*, 110 F.3d at 1445 n. 16, and proclaiming that all affirmative action programs constitute disfavored legislation, whether or not they are constitutional. *See id.* at 1445. The *proponents* of affirmative action, responding on the level of social policy, would no doubt argue that such programs do in fact secure equality because they level the playing field by remedying the inequalities that are the product of the long history of state-sponsored discrimination that followed the Civil War. This is the rhetorical framework within which the debate over affirmative action has unfolded in the halls of American government. As a political manifesto, the panel's opinion could comfortably assume a place on one side of that debate. As a document that purports to apply the Constitution as interpreted by the Supreme Court, however, the opinion fails at its appointed task.

The question of the constitutionality of Proposition 209 has nothing to do with the wisdom of affirmative action programs. The *Hunter–Seattle* doctrine does not call for judges to determine whether constitutionally permissible, beneficial programs are also wise and just means of securing equality. Rather, the "equality" that the *Hunter–Seattle* doctrine secures is the equality of *opportunity* that the Constitution guarantees to minority groups to use the channels of representative government to "achieve legislation that is in their interest." *Hunter*, 393 U.S. at 395, 89 S.Ct. at 563 (Harlan, J., concurring).

## II

The panel offers a number of other, subsidiary arguments in its attempt to distinguish *Hunter* and *Seattle*. These arguments are no more convincing than the panel's attempt to inject a subjective "equality" test into the *Hunter–Seattle* doctrine.

### A

The panel first appeals to the commonsense notion that legislatures should not be "constitutionally *required*" by courts to pursue any particular legislative policy or program.

> To hold that a democratically enacted affirmative action program is constitutionally permissible because the people have demonstrated a compelling state interest is hardly to hold that the program is constitutionally required. The Fourteenth Amendment, lest we lose sight of the forest for the trees, does not require what it barely permits.

*CEE v. Wilson,* 110 F.3d at 1446.

As the panel must have understood, the district court did not hold that any particular legislation, including race-based preference programs, was "constitutionally required." The *Hunter–Seattle* doctrine does not *ask* whether any particular legislation is ever constitutionally required. The Supreme Court did not hold that either the antidiscrimination laws in *Hunter* or the remedial busing program in *Seattle* was constitutionally required. What the Court did hold is that states may not place political obstacles in the way of laws that favor minorities, nor may they remove such laws wholesale from the political process. All that is constitutionally required is that minorities have the *opportunity,* on equal terms, to seek "legislation in [their] behalf" within existing channels of government. *Hunter,* 393 U.S. at 392–93, 89 S.Ct. at 561–62.

### B

The panel next suggests that Proposition 209 does not implicate the *Hunter–Seattle* doctrine because, in fact, it does not selectively restructure the political process. The panel argues that by forbidding race-related programs in employment, education, and contracting at *every* level of representative government—rather than doing so at only one level, as in *Seattle*—the State has "addresse[d] in neutral fashion race-related and gender-related matters" and so has not offended *Hunter* or *Seattle. CEE v. Wilson,* 110 F.3d at 1444.

Once again, the panel makes an argument that finds no support in law or reason. The *Hunter–Seattle* doctrine holds that it works an injury upon minorities to subject them to a structural disadvantage in the political process. It therefore forbids the State from "differentiat[ing] between the treatment of problems involving racial matters and that afforded other problems in the same area." *Seattle,* 458 U.S. at 480, 102 S.Ct. at 3200 (citations omitted). In *Seattle,* as the panel correctly observes, the State of Washington had inflicted this injury upon minorities at only one level of government: local school districts. What the panel suggests is that if the State inflicts a *Hunter–Seattle* injury at *every* level of representative government and "differentiates between the treatment of problems involving racial matters and that afforded other problems" in local school boards *and* city councils *and* the state legislature *and* state agencies such as the University of California Board of Regents, then the constitutional error is somehow cured. *See CEE v. Wilson,* 110 F.3d at 1443–44. Neither *Hunter* nor *Seattle*—nor common sense, for that matter—supports the proposition that *expanding* the levels at which the State disadvantages minorities will render that action any less constitutionally suspect.[2]

---

**2.** In making this extraordinary argument, the panel appears to rely exclusively upon language that it quotes out of context from a footnote in *Seattle* that discusses the distribution of authority between state and local governments in Washington. *See Seattle,* 458 U.S. at 479 n. 22, 102 S.Ct. at 3200 n.22 ("We also note that the State has not attempted to reserve to itself exclusive power

to deal with racial issues generally."); *CEE v. Wilson,* 110 F.3d at 1444. This attempt is unavailing. *Seattle* clearly held that "when the political process or the decisionmaking mechanism used to address racially conscious legislation—and only such legislation—is singled out for peculiar and disadvantageous treatment, the government action plainly rests on distinctions

## C

Next the panel would have us believe that *Hunter* and *Seattle* are inapposite because Proposition 209 burdens *majority*, not minority, interests.[3] In putting forward this remarkable argument, the panel seizes upon a statement in *Hunter* that "[t]he majority needs no protection against discrimination." *Hunter*, 393 U.S. at 391, 89 S.Ct. at 560; *CEE v. Wilson*, 110 F.3d at 1441. It then puts its own spin on the word "majority" by turning women and racial minorities into one undifferentiated "group." *See id.* at 1441–43. In other words, the panel transforms racial minorities into a numerical majority by lumping them together with women. Presto! Proposition 209 burdens the interests of the majority, not the minority. To borrow the panel's (uncited) paraphrase of Justice Scalia, "if merely stating this alleged 'equal protection' [argument] does not suffice to refute it, our constitutional jurisprudence" has gone very far astray. *See id.* at 1439 (*quoting but not citing Romer v. Evans*, —— U.S. ——, ——, 116 S.Ct. 1620, 1630, 134 L.Ed.2d 855 (1996) (Scalia, J., dissenting)).[4]

## D

Finally, the panel turns to *Crawford v. Board of Education of the City of Los Angeles*, 458 U.S. 527, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982), in its attempt to distinguish *Hunter* and *Seattle*. *See CEE v. Wilson*, 110 F.3d at 1443, 1445–46. For the same reason that the *Hunter–Seattle* doctrine controls this case, however, *Crawford* has no bearing upon the constitutionality of Proposition 209.

*Crawford*'s focus is on the difference between the "mere repeal" of existing, minority-oriented legislation and the systematic obstruction of such legislation in the future. It holds that a "mere repeal," unlike systematic obstruction, does not violate equal protection.

In *Crawford*, the people of California amended their Constitution to do away with a substantive right that the state's Equal Protection Clause had conferred above and beyond what was required by the Federal Constitution: the right to be free from de facto segregation in the public schools. The new amendment effectively repealed this right by rendering it unenforceable in state court. *See id.* at 529–35, 102 S.Ct. at 3213–17. In rejecting a *Hunter–Seattle* challenge to that amendment, the Supreme Court held that "the Equal Protection Clause is not violated by the mere repeal of race-related legislation or policies." *Id.* at 538, 102 S.Ct. at 3218. Thus, *Crawford* permits the states to repeal any existing affirmative action programs, even though the repeal might operate to the detriment of minorities, so long as they do not *prospectively* disadvantage minorities in the political process.

Proposition 209, of course, is not a mere repeal of existing affirmative action programs. Had the initiative simply repealed all such programs throughout the state and left minority groups free to lobby the institutions of representative government for their reenactment, then *Crawford* might well control this case. Proposition 209 does much more, however: It forbids all institutions of representative government from enacting race- or gender-based affirmative action programs—and only those programs— *in the future*. A measure that places permanent political obstacles in the way of minority-oriented legislation violates the *Hunter–Seattle* doctrine and cannot fit itself within the "mere repeal" doctrine of *Crawford*.

## III

When a federal court disregards Supreme Court precedent, it jeopardizes the founda-

---

based on race." *Seattle*, 458 U.S. at 485–86, 102 S.Ct. at 3203.

3. Even the Attorney General of the State of California, in defending Proposition 209, was not prepared to make this argument. It is advanced only by intervenor Californians Against Discrimination and Preferences, Inc. *See CEE v. Wilson*, 110 F.3d at 1441.

4. Curiously, after devoting three pages of its opinion to the enthusiastic development of the argument that Proposition 209 burdens majority, not minority, interests, the panel disclaims any reliance upon it, instead "accept[ing]" without questioning the District Court's findings that Proposition 209 burdens members of insular minorities within the majority that enacted it who otherwise would seek to obtain race-based and gender-based preferential treatment from local entities." *CEE v. Wilson*, 110 F.3d at 1441–43, 1442.

tion upon which the entire judiciary rests in our constitutional system of government. The power of the federal courts "lies ... in [their] legitimacy, a product of substance and perception that shows itself in the people's acceptance of the Judiciary as fit to determine what the Nation's law means and to declare what it demands." *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 865, 112 S.Ct. 2791, 2814, 120 L.Ed.2d 674 (1992) (Joint Opinion of O'Connor, Kennedy, and Souter, JJ.). Faithful adherence to precedent does not always come easily. "Some cost will be paid by anyone who approves or implements a constitutional decision where it is unpopular, or who refuses to work to undermine the decision or to force its reversal." *Id.* at 867, 112 S.Ct. at 2815. Even the broad mantle of protection that Article III offers cannot completely shield federal judges from these heavy costs. We must sometimes implement precedent that comes into conflict with our most deeply held personal convictions. In those instances, for judges as much as anyone else, "[a]n extra price will be paid by those who themselves disapprove of the decision's results when viewed outside of constitutional terms." *Id.* at 867–68, 112 S.Ct. at 2815. I would never minimize or belittle the burden that judges must bear when they are presented with a fundamental issue of conscience and called upon by binding Supreme Court precedent to render a decision whose substantive result violates their deeply held convictions.

It is the responsibility of *all* federal judges, however, to "struggle to accept [that burden]." *Id.* at 868, 112 S.Ct. at 2815. We must do so "because [we] respect the rule of law." *Id.* It is the particular responsibility of the judges of lower federal courts, moreover, to abide by the precedent that binds us without regard to changes in the political climate of the Nation—or even changes in the sentiment of the Supreme Court—that we think might cast a favorable eye upon a different result. "If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989). The federal courts of appeals are neither final nor infallible,[5] and our duty is more constrained than we might sometimes wish it to be.

I submit, with all due respect, that the *Coalition* panel has neglected this duty in favor of a path of conservative judicial activism. Its failure to hold Proposition 209 unconstitutional on the authority of *Hunter* and *Seattle* is unsupportable as a matter of law. I deeply regret that a majority of our active judges—some, perhaps, assuming that the Supreme Court will correct the panel's error—has failed to vote to rehear this case en banc.

HAWKINS, Circuit Judge, commenting on the denial of rehearing en banc.

The panel was faced with the task of filtering a citizen initiative through its understanding and interpretation of the Constitution. Apparently because the panel believed there was no recent authority directly on point, it chose to do what courts often must do: interpret and apply existing authority to the legal challenge presented. At the end of the day, that is the same task in which the district court was engaged. I have no doubt that both the district court and my colleagues on the panel acted in the utmost good faith in doing so. But therein lies an interesting and important question of jurisprudence. It has nothing to do with the merits of affirmative action; it has everything to do with the way in which courts subject to review by higher authority carry out their duties. It is about the proper role of an inferior court faced with contrary, but apparently controlling, precedent that it honestly and earnestly believes will not be followed (or will be distinguished) by higher authority. Is it the role (the duty, if you will) of a court in that circumstance to attempt to accurately predict what the higher authority will do? Or is its

---

5. *See Brown v. Allen*, 344 U.S. 443, 540, 73 S.Ct. 397, 427, 97 L.Ed. 469 (1953) (Jackson, J., concurring in judgment) ("We are not final because we are infallible, but we are infallible only because we are final.").

duty to faithfully follow existing precedent? If an inferior court in such a circumstance is free to predict what the higher court will do, then this panel probably got the issue right.[1] If, however, the duty of a lower court is to faithfully apply existing authority, then I have seen no persuasive argument that contradicts Judge Norris' *Carolene Products–Hunter–Seattle* analysis.[2]

The Supreme Court may well tell us that this case is not governed by that line of authority or that an exception to the application of those cases should be made for this particular measure. Until that happens, it is not our role to predict—however accurate our predictions might turn out to be.[3]

---

1. For an analysis of the theory of predictionism, see Richard A. Posner, *The Problems of Jurisprudence* 221–28 (1990). For a case in which a circuit court engaged in such precedent-defying predictionism and was criticized by the Supreme Court for doing so, see *Rodriguez de Quijas v. Shearson/American Express*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989) (Kennedy, J.), *aff'g Rodriguez De Quijas v. Shearson/Lehman Bros.*, 845 F.2d 1296, 1298–99 (5th Cir.1988).

2. Justice Stevens, dissenting in *Rodriguez*, described the Fifth Circuit's decision as "an indefensible brand of judicial activism." 490 U.S. at 486, 109 S.Ct. at 1923 (1989) (Stevens, J., dissenting).

3. "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez*, 490 U.S. at 484, 109 S.Ct. at 1921–22 (Kennedy, J.). *Accord Agostini v. Felton*, —— U.S. ——, ——, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997) (O'Connor, J.).