**Keeley Tatsuyo HUNTER, a minor, by Gina F. BRANDT, her mother and next friend, Plaintiff,**

v.

**The REGENTS OF THE UNIVERSITY OF CALIFORNIA and Theodore R. Mitchell, Defendants.**

No. CV 95–3301 KN.

United States District Court, C.D. California.

June 20, 1997.

**1318**

James K.T. Hunter, Los Angeles, CA, Mark T. Gallagher, Pacific Legal Fund, Sacremento, CA, for Plaintiffs.

Dennis M. Perluss, Morrison & Foerster, L.L.P., Los Angeles, CA, Jeffrey A. Blair, University of California, Oakland, CA, for Defendants.

### TRIAL ORDER RE: FINDINGS OF FACT AND CONCLUSIONS OF LAW

KENYON, District Judge.

Plaintiff Keeley Tatsuyo Hunter, ("Hunter" or "Plaintiff"), a minor, brings this action by Gina F. Brandt ("Brandt"), her mother and next friend, against defendants The Regents of the University of California ("the Regents") and Theodore R. Mitchell, Dean of the Graduate School of Education and Information Studies ("GSE & IS") and Vice Chancellor of Academic Planning and Budget at the University of California, Los Angeles ("Dean Mitchell"). Having previously granted the defendants' motion for judgment on the pleadings as to Plaintiff's first and third causes of action,[1] the Court conducted a two-day bench trial on Plaintiff's remaining claims. Based on the evidence and arguments presented at trial, the Court sets forth its findings of fact and conclusions of law as follows:

### I. PARTIES AND JURISDICTION

Hunter is a female child born on November 26, 1990. She is a United States citizen who claims her ethnic identity as one-quarter Asian and three-quarters Caucasian. This suit is brought on Hunter's behalf by her mother and next friend, Brandt.

The Regents is a corporation vested with legal title and the management and disposition of the property of the University of

---

1. The Court granted the Regents' motion for judgment on the pleadings as to Plaintiff's first and third claims for relief on the grounds of Eleventh Amendment immunity. *See* Order Re: P.'s Mot'n for Reconsideration, Aug. 21, 1996, at 9:19–22. The Court also granted Dean Mitchell's motion for judgment on the pleadings as to Plaintiff's third cause of action because Plaintiff's claim is covered by the exclusive remedy offered by 42 U.S.C. section 1983. *Id.* at 11:23–12:3.

California, with the power to be sued, as provided by Section 9, Article IX of the California Constitution. The Regents receive substantial federal financial assistance and, for the purposes of this suit, admit to being a state actor.

Dean Mitchell is currently Vice Chancellor of Academic Planning and Budget at UCLA, and remains Dean (on leave) of the GSE & IS. Dean Mitchell was Dean of the GSE & IS during the 1995–96 admissions cycle during which the Plaintiff's application to the Corinne A. Seeds University Elementary School ("UES"), which is operated by the GSE & IS, was submitted and denied. Dean Mitchell is sued solely in his official capacity.

Hunter brings this action against the Regents under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d,[2] and against Dean Mitchell under 42 U.S.C. § 1983[3] based on the defendants' alleged illegal and unconstitutional acts of discrimination. Federal jurisdiction is proper under 28 U.S.C. §§ 1331 and 1367 in that the instant action arises under the Constitution and laws of the United States. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that all parties reside in the Central District of California and a substantial portion of the events giving rise to the Plaintiff's claims occurred in this District.

## II. HISTORY OF THE CASE

UES is a laboratory elementary school operated by UCLA's GSE & IS. UES has a student population of approximately 460 children, ages four through twelve, who attend pre-kindergarten through sixth grade.[4] The stated mission of UES is to conduct research relevant to the urban educational experience and to work with teachers, communities and schools to disseminate that research to foster a more effective educational system primarily for urban elementary students.[5]

On or about December 12, 1994, Plaintiff's mother Gina F. Brandt signed, and Plaintiff's father, James K.T. Hunter, authorized Brandt to sign on his behalf, the 1995–1996 Admissions Application seeking their child's admission to the 1995–1996 UES entering class for four-year-olds (the Early Childhood or EC–1 Program). Brandt submitted the application form for consideration to UES. Plaintiff was one of 215 applicants for admission to the 1995–1996 EC–1 Program, 46 of whom received admission. In the section of the Admissions Application entitled "Child's Ethnic Identity (optional)," Plaintiff was identified by Brandt as "Asian–American (specify): Japanese" and "Caucasian." Unfortunately, Plaintiff's parents were notified on March 11, 1995, that their daughter had not been selected for admission to the 1995–96 EC–1 class. As a result, Plaintiff brought the instant suit challenging the constitutionality of UES's admission policy.

By order filed on September 18, 1995, this Court granted Hunter's application for a preliminary injunction requiring her admission to the 1995–96 EC–1 class. Hunter is currently enrolled in her second year at UES, essentially kindergarten.

On July 25, 1996, the Court ruled that Dean Mitchell is entitled to the defense of qualified immunity to Plaintiff's claim for damages. See Order Re: Def. Theodore Mitchell's Mot'n for Summ. Adjud., July 29, 1996, at 9:4–16. In a separate order dated the same day, the Court granted the Re-

---

2. Title VI provides that, "No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

3. Section 1983 provides in relevant part:

 Every person who, under color of any statute ..., subjects, or causes to be subjected, any citizen of the United States or other person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

4. UES is the only publicly supported elementary laboratory school in this State. Deborah J. Stipek is a Professor at GSE & IS and the current Director of UES. Professor Stipek was Director of UES during the 1995–96 admissions cycle.

5. For instance, UES's research methods and results are shared with the GSE & IS's Urban Education Studies Center where nationally recognized scholars work together with educators and administrators to foster a better schooling system for California children.

gents' motion for summary judgment against Plaintiff's claims of discrimination based on the admission criteria of wealth, fame, and political influence. *See* Order Re: Def. Regents Mot'n for Summ. Judg., July 25, 1996, at 10:6–12.

Subsequently, on August 21, 1996, the Court denied Plaintiff's motion for summary adjudication of the legal issues in her remaining claim that UES's race/ethnicity admission criteria violate the Fourteenth Amendment. The Court held that factual issues remained as to whether the use of race/ethnicity in the admissions process (1) serves a compelling state interest, and (2) is narrowly-tailored to accomplish this goal. These issues—framed as Plaintiff's Title VI claim against the Regents and 42 U.S.C. § 1983 claim against Dean Mitchell—are all that remain of the current action.

### III. FINDINGS OF FACT

#### A. UES's Admission and Recruitment Policies

The UES Admissions Committee is comprised of three UES teachers and two GSE & IS faculty members, one of whom serves as the committee chairperson. The admission process does not entail pre-selection interviews, achievement/ability testing or competitive criteria rankings of the applicants.

As part of its admission policy, UES does not consider the race of its applicants for the purpose of enhancing the educational opportunities of disadvantaged children admitted to the school; nor does UES consider its applicants' ethnicity to improve the general educational experience for the admitted students by promoting diversity in the classroom. In addition, the Admissions Committee does not consider race or ethnic background as a remedy for past societal

discrimination. Rather, UES considers its applicants' races and ethnic identities only in an attempt to obtain an adequate cross-sample of the general population for the purpose of maintaining the scientific credibility of its educational studies. Students enrolled at UES are research subjects and are covered by all federal, state and university guidelines, rules and policies regarding the treatment of human subjects.

To achieve the ethnically diverse population of students allegedly necessary for its educational research program, UES conducts extensive recruiting and outreach programs designed to increase the number of minority and disadvantaged applicants. Such outreach efforts include advertising in local newspapers with large minority readership, distribution of information about UES to the directors of other ethnic studies programs at UCLA, and dissemination of thousands of mailers and flyers to UCLA campus departments, current UES parents, and offcampus organizations such as Head Start Centers.

#### B. 1995–96 EC–1 Class Admission Policy and Statistics

For the 1995–96 school year, the Admissions Committee utilized the following procedure in selecting applicants for admission to the EC–1 Program:

First, the 20 siblings of current UES students who applied for admission were identified and admitted;[6]

Second, the Admissions Committee, under the guidance of Dean Mitchell and Professor Stipek, formulated a target number for each racial/ethnic group to be admitted;

Third, dominant Spanish-speaking applicants were identified and a number of them were selected for admission;[7]

---

6. Plaintiff's older sister, Cia, graduated from UES just prior to the time of Plaintiff's application. Accordingly, Plaintiff was not considered for admission as a sibling of a currently enrolled student. During Cia Hunter's term of enrollment at UES, both James K.T. Hunter and Gina Brandt became parent volunteers in UES's Early Childhood Unit. Brandt served on the Board of the Family School Alliance and as President and Co–President of the Family School Alliance which fought to keep UES situated on the UCLA

campus in Westwood, California. Brandt was also a founding member of the UES Family Alumni Association and served on the fundraising committee for the Friends of UES.

7. Plaintiff does not challenge UES's decision to admit a larger sample of Spanish-speaking students as the basis for research in bilingual educational methods.

Fourth, applicants from each self-identified racial/ethnic group were chosen at random to create a shorter list of potential admittees;[8]

Fifth, from the children randomly selected within each racial/ethnic classification, further sorting was done to ensure a reasonable gender balance and to distribute the admitted children among income groups.

UES also admits a limited number of children each year, in the discretion of the Dean of the GSE & IS, to further the mission of UES and to advance the interests of UCLA, including recruiting faculty and staff for the University. In the 1995–96 admission year, these "Dean's admits" were substituted for randomly-selected children with the same gender, race/ethnicity and income as would have otherwise been granted admission.

In selecting students to be admitted to the 1995–96 EC–1 Program, UES sorted all applicants into six racial categories: African–American, Asian–American, Native American, Latino, Caucasian, and Other (Mixed Race). The demographic racial breakdown of the 215 children who applied for admission into the 1995–96 EC–1 Program, as self-reported, was as follows: 110 Caucasians (51.2%); 49 mixed race (22.8%); 23 African–Americans (10.7%); 19 Asians (8.8%); and 14 Latinos (6.5%). The demographic racial breakdown of the 46 children admitted into the 1995–96 EC–1 Program was as follows: 10 Latinos (21.7%); 6 African–Americans (13%); 4 Asians (8.7%); 18 Caucasians (39.1%); and 8 mixed race (17.4%).

The pool of 215 applicants consisted of 110 girls and 105 boys. Twelve (12) girls were siblings and eight (8) boys were siblings. As previously mentioned, all 20 of the sibling applicants were admitted. Twenty-six (26) of the remaining 195 non-sibling applicants were selected for admission (13.3%). Ninety-eight (98) of the remaining 195 non-sibling applicants were girls (50.3%), and of these, twelve were admitted (12.2%).

The pool of 49 applicants who self-identified themselves as mixed race consisted of 23 girls and 26 boys. Three of the girls were siblings (each admitted), and none of the boys was a sibling. Therefore, of the eight mixed race admittees (4 girls and 4 boys), five mixed race non-sibling children were selected from the applicant pool of 49 (10.2%). Only one self-identified female non-sibling mixed race child was selected from the relevant applicant pool of 20 female non-sibling self-identified mixed race applicants (5%).[9]

## IV. LEGAL ANALYSIS AND CONCLUSIONS OF LAW

Plaintiff's remaining claims aver that by UES's use of racial and ethnic admission criteria, the Regents and Dean Mitchell discriminated against her in violation of her Fourteenth Amendment right to equal protection under the law. U.S. Const. amend. XIV, § 1; 42 U.S.C. § 1983; 42 U.S.C. § 2000d (Title VI). However, based on the above described factual findings, and the legal analysis provided below, the Court believes that the defendants are not liable for the alleged violation of Plaintiff's constitutional right to equal protection.

### A. Standard of Review and Burden of Proof

■ The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. The threshold question for any constitutional claim founded upon equal protection grounds is whether the challenged governmental action treats differently two otherwise similarly situated individuals. See *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 2331–32, 120 L.Ed.2d 1 (1992) (upholding California Proposition 13's Article XIIIA amendment to the California Constitution); *see also The Coalition for*

---

8. Selection from within these groupings was accomplished by computer-generated random numbers.

9. Of the 46 children initially accepted for the 1995–96 EC–1 Program, 24 were girls and 22 were boys. In addition, 15 of the children (33%) were from families with annual incomes below $35,000; 14(30%) were from families with annual incomes from $35,000 to $119,999; and 17(37%) were from families with annual incomes of $120,000 or more.

*Economic Equity v. Wilson*, 110 F.3d 1431, 1440 (9th Cir.1997) ("The first step in determining whether a law violates the Equal Protection Clause is to identify the classification that it draws."). Once it is established that the government action uses race or ethnicity as a basis by which to separate similarly situated persons, a court's legal analysis must turn towards a determination of the legality of the classification.

 Governmental racial and ethnic classifications have a tendency to stigmatize individuals, polarize society, and incite racial hostilities. See *Shaw v. Reno*, 509 U.S. 630, 643, 113 S.Ct. 2816, 2824–25, 125 L.Ed.2d 511 (1993) ("*Shaw I* "); *Kiyoshi Hirabayashi v. United States*, 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1943). Persons disadvantaged by such racial or ethnic categorizations necessarily suffer a cognizable injury. See *Adarand Constructors v. Pena*, 515 U.S. 200, 230, 115 S.Ct. 2097, 2114, 132 L.Ed.2d 158 (1995). Therefore, in order to pass constitutional muster, a racial classification, regardless of its purported motivation,

must be narrowly tailored to serve a compelling government interest. See, e.g., *Id.* at 227–28, 115 S.Ct. at 2113; *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277–78, 106 S.Ct. 1842, 1848–49, 90 L.Ed.2d 260 (1986) (plurality opinion); see also *The Coalition for Economic Equity*, supra, 110 F.3d at 1440.[10] The burden traditionally rests with the state actor to justify the offending classification scheme in the face of this strict scrutiny. See *Shaw I*, supra, at 642–43 & 653, 113 S.Ct. at 2824–25, 2830 (requiring strict scrutiny of all racial classifications because without it, courts cannot determine whether the challenged discrimination is truly "benign").[11]

### B. Unequal Treatment of Similarly-Situated Applicants

As previously discussed, the first step in any analysis of an equal protection claim is to determine whether or not the contested form of discrimination actually treats similarly situated individuals in a disparate fashion. *The Coalition for Economic Equity*, supra, 110

---

**10.** This "standard of review under the Equal Protection Clause does not depend on the race ... of those burdened or benefited by a particular classification." *The Coalition for Economic Equity*, supra, 110 F.3d at 1439 (vacating preliminary injunction of California's Proposition 209) (citing *Richmond v. J.A. Croson*, 488 U.S. 469, 494, 109 S.Ct. 706, 722, 102 L.Ed.2d 854 (1989) (plurality opinion)).

**11.** The defendants also challenge the Court's previous holding that Plaintiff should be "entitled to a permanent injunction directing her admission to UES unless [the] Regents can carry its burden of establishing that Plaintiff would not have been admitted even if the Race/Ethnicity Selection Criterion had not been utilized." See Memo. of Cont. of Fact and Law of Defs., filed Nov. 18, 1996, at 28:14–18. The defendants maintain that the Supreme Court's decision in *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993), places the ultimate burden of persuasion to prove discrimination on the Plaintiff. The Court disagrees with the defendants' attempted application of *Hicks*, a Title VII case, to the case at bar. Unlike the employment discrimination situation litigated in *Hicks*, the defendants in this case do not contest their intentional use of racial and ethnic considerations in the UES admission policy. See *infra* note 12. As a result, the Court need not engage in the burden shifting analysis normally associated with Title VII cases. See generally *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In reviewing this

use of race and ethnicity criteria, the Court believes it is bound to apply a standard of strict scrutiny. *Adarand*, supra, at 227–28, 115 S.Ct. at 2113.

The defendants may be correct that even if Plaintiff were to prevail, she would not be entitled to a permanent injunction requiring her admission to UES, but rather to an order permitting her reapplication to the school under new constitutional admission criteria. However, such a ruling is made moot by the Court's ultimate judgment that the UES race and ethnicity criteria actually survive strict scrutiny review. See *United States v. Virginia*, —— U.S. ——, ——, 116 S.Ct. 2264, 2282, 135 L.Ed.2d 735 (1996) (finding that the categorical exclusion of women from the state-sponsored Virginia Military Institute violated the Equal Protection Clause, but holding that the remedial decree must place the plaintiffs in the position in which they would have been absent the discrimination); *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 320–21 n. 54, 98 S.Ct. 2733, 2763–64 n. 54, 57 L.Ed.2d 750 (1978) (Powell, J.) (finding that "there [was] no question as to the sole reason for [Bakke's] rejection—purposeful racial discrimination in the form of the special admissions program"); accord *Hopwood v. State of Texas*, 78 F.3d 932, 958 (5th Cir.1996) (plaintiffs were entitled to reapply to University of Texas Law School under a system of admissions that did not discriminate on race), cert. denied, —— U.S. ——, 116 S.Ct. 2581, 135 L.Ed.2d 1095.

F.3d at 1440. The Fourteenth Amendment does not require that the State treat all citizens identically, but rather only that those individuals who are similarly situated be treated equally. *See Nordlinger, supra,* at 10, 112 S.Ct. at 2331 (holding that the "Equal Protection Clause does not forbid classifications," but "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike") (citing *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561–62, 64 L.Ed. 989 (1920)); *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (citing *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982)).

█ The defendants assert that in the case of UES's admission procedures, no similarly situated applicants for the EC–1 class were treated differently based upon their self-proclaimed race or ethnic identity. The Court disagrees.[12] The UES Admissions Committee separated the 215 total applicants into different racial and ethnic categories. After all 20 of the sibling-related applicants were admitted, a random lottery system was used to make an initial selection of a previously determined target number [13] of children from each racial category to whom offers of admission might be extended. This randomly selected group of admittees was then adjusted following a further sorting to balance the class in terms of gender and income levels. Naturally, the chances for selection from any one of the sorted groups depended upon: (1) the number of non-sibling applicants in that group; (2) the total number of applicants in that group; (3) the number of "Dean's admits" in that category; and (4) the previously determined target percentage of children from that category that the defendants felt was necessary to obtain the research population required to fulfill the school's mission. However, the Admissions Committee's employment of a lottery does not negate its initial disparate treatment of similarly situated persons as a result of having first divided the applicants by their race and ethnicity. The fact that each applicant's chances for admission were necessarily benefitted or disadvantaged by his or her racial identity compels a finding that the defendants' creation of racial targets and categories must withstand strict scrutiny.

█ The defendants' attempt to distinguish procedurally their admission policy from the "dual admission program" invalidated in *Bakke* provides little support.[14] In *Bakke,* the Supreme Court determined that Davis Medical School's policy of reserving 16 of 100 admission slots for certain disadvantaged minority applicants, while still permitting those disadvantaged minorities to compete for the remaining 84 slots, violated the Equal Protection Clause. *Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265, 319–20, 98 S.Ct. 2733, 2763, 57 L.Ed.2d 750 (1978)

---

12. The defendants provide no argument why the Court's analysis should not start from the premise that Plaintiff was similarly–situated with other applicants, and therefore deserved to be treated in an equal manner with other applicants. It would be circuitous for the defendants to contend that Plaintiff's application was justifiably treated in a dissimilar fashion because of her race. Furthermore, the Court is convinced that the defendants' use of racial classifications was a form of intentional discrimination. While the defendants may have acted in good faith, they purposefully employed the use of racial and ethnic admissions criteria. *See Hopwood,* 78 F.3d, at 957 (5th Cir.1996) (reviewing University of Texas Law School's admission policy) (citing, *inter alia, Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992)).

13. The parties squabble over the whether the Admissions Committee's predetermined percentage of children to be admitted from each racial category should be classified as a racial "quota" or merely a "target-preference." Given the nature of this case, the Court does not believe it necessary to make such a semantic distinction. As discussed below in greater detail, the Court believes UES's admission policy treated similarly-situated individuals differently. *See infra* (comparing UES's admission policy to the University of California at Davis Medical School's admission policy at issue in *Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978)). As a result, the Court must apply a strict standard of judicial review.

14. The defendants are successful, however, in proving that the UES admission policy is substantively distinct from the University of California at Davis Medical School's admission program. *See infra* sections IV.C. & D. (concluding that UES's admission policy is narrowly tailored to support a compelling state interest).

(Powell, J.). In so ruling, the Court made clear that it is the individual, not the group, who is entitled to judicial protection from classification based upon race or ethnic background. *Id.* at 299, 98 S.Ct. at 2753; *see also Adarand, supra,* at 225–27, 115 S.Ct. at 2112–13; *The Coalition for Economic Equity, supra,* 110 F.3d at 1441. "[A]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Adarand, supra,* at 224, 115 S.Ct. at 2111. This is because "there is simply no way of determining [without strict judicial review] what classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics." *Id.* at 226, 115 S.Ct. at 2112 (quoting *Richmond v. J.A. Croson,* 488 U.S. 469, 493, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989) (plurality)).

Similar to Bakke's chances of being admitted to Davis Medical School, Plaintiff's chances of being accepted to UES were impacted by the number of applicants who self-identified themselves with the same or different racial and ethnic identity. Plaintiff challenges the Admissions Committee's decision to separate the applicants by race and ethnicity in the first place. For this reason, UES's admission policy cannot be shielded from strict scrutiny simply because Plaintiff was not directly competing for the same admission slots as applicants who self-identified in a different racial category, even if all categories were subject to the same lottery system. *Bakke, supra,* at 315, 98 S.Ct. at 2761 (holding that a "multitrack program with a prescribed number of seats set aside for each identifiable category of applicants," as opposed to the two-track system at issue in *Bakke,* would still be subject to strict scrutiny). The Admissions Committee's ethnic and racial target preferences undoubtedly influenced Plaintiff's chances for admission.

As a result, Plaintiff deserves a strict judicial review of the UES admission policy.

### C. Compelling Governmental Interest

The defendants proffer two reasons why the UES admission policy furthers a compelling governmental interest: (1) the state has a compelling interest in research on effective urban educational strategies, including dissemination of acquired knowledge about current or innovative educational practices; and (2) the state has a compelling interest in promoting academic freedom as embodied by the First Amendment. In response, Plaintiff maintains that because UES's admission procedures are not designed to remedy past or present forms of discrimination, they cannot *per se* rise to the level of a compelling state interest. Plaintiff further contends that the two justifications are too amorphous and lack sufficient evidentiary grounding to withstand strict scrutiny.

Having considered the parties' testimony and analyzed their legal arguments in terms of the factual situation of this particular case, the Court is persuaded that the defendants' interest in operating a research-oriented elementary school is compelling. The Court does not agree with the defendants that the promotion of academic freedom, by itself, can justify racial classifications. *See Bakke, supra,* at 314, 98 S.Ct. at 2761 (Powell, J.) ("Although a [school] must have wide discretion in making the sensitive judgments as to who should be admitted, constitutional limitations protecting individual rights may not be disregarded."). On the other hand, the state's interest in maintaining academic freedom offers significant support for the defendants' argument that the Court should afford deference to the necessity of racial diversity for the research conducted at UES.[15]

### 1. Remedying Past Discrimination Is Not the Only Compelling State Interest

Plaintiff relies on the Supreme Court's plurality decision in *Croson* to sup-

---

**15.** *See University of Penn. v. EEOC,* 493 U.S. 182, 199, 110 S.Ct. 577, 587, 107 L.Ed.2d 571 (1990) ("[C]ourts have stressed the importance of avoiding second-guessing of legitimate academic judgment. This Court itself has cautioned that 'judges ... asked to review the substance of a genuinely academic decision ... should show great respect for the faculty's professional judgment.") (citation omitted).

port the proposition that, as a matter of law, remedying past discrimination is the only compelling state interest that will support race-conscious state action. *See Croson*, 488 U.S. at 469, 109 S.Ct. at 708 (O'CONNOR, J., for plurality). Yet, a careful reading of *Croson* and the line of cases derived from it leads the Court to conclude that Plaintiff misinterprets the scope of Justice O'Connor's plurality reasoning in *Croson*.

In *Croson*, Justice O'Connor warned that, "Classifications based on race carry a danger of stigmatic harm. Unless they are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to politics of racial hostility." *Croson, supra*, at 493, 109 S.Ct. at 722. Justice O'Connor's opinion was joined only by Chief Justice Rehnquist, Justice White, and Justice Kennedy; [16] certainly not a majority opinion of the Court.[17] However, Justice Stevens, who had otherwise joined Justice O'Connor in announcing the majority opinion, wrote separately to express his belief that remedial motivations are not the only legitimate form of a compelling state interest. *Id.* at 511 n. 1, 109 S.Ct. at 731 n. 1 ("In my view the Court's approach to this case gives unwarranted deference to race-based legislative action that purports to serve a purely remedial goal, and overlooks the potential value of

race-based determinations that may serve other valid purposes.").[18] As far as this Court may ascertain, no majority of the Court has ever explicitly held that remedial action may constitute the only valid compelling state interest.

Plaintiff's reliance on *Croson* is in no way strengthened by her attempted application of subsequent Supreme Court rulings in *Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547, 612–13, 110 S.Ct. 2997, 3034–35, 111 L.Ed.2d 445 (1990) (O'CONNOR, J., dissenting) (restating *Croson* plurality), and *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), *overruling in part, Metro Broadcasting*.[19] In *Metro Broadcasting*, the Supreme Court upheld the Federal Communication Commission's minority broadcasting benefits program. In so doing, a majority of the Court considered the FCC's form of discrimination to be benign, despite its admitted lack of remedial purpose, and applied only intermediate scrutiny to its review of the program. *Metro Broadcasting, supra*, at 566, 110 S.Ct. at 3009–10. In support of its holding, the majority quoted Justice O'Connor's apparently inconsistent prior opinion in *Wygant v. Jackson Board of Education*. *Id.* at 568 n. 15, 110 S.Ct. at 3010 n. 15. In *Wygant*, Justice O'Connor noted that

**16.** Justice Kennedy's concurrence in *Croson*, despite its joinder with all but Part II of Justice O'Connor's opinion, does not seem to wholeheartedly support the view that remedial measures are the only legitimate compelling state interest. Justice Kennedy refused to adopt a rule of automatic invalidity for all racial preferences; but instead chose to reaffirm the case-by-case application of strict scrutiny, noting that "the strict scrutiny standard will operate in a manner generally consistent with the imperative of race neutrality." at 519.

**17.** In addition, one would be hard-pressed to assume that Justice Marshall, Justice Blackmun, and Justice Brennan, all of whom dissented from the *Croson* majority (albeit without explicit repudiation of the plurality portion of the opinion) would support the belief that remedial actions are the sole form of a compelling state interest. *Id.* at 528–62, 109 S.Ct. at 740–57.

**18.** Justice Stevens' reiteration in *Croson* of his own dissent in *Wygant v. Jackson Board of Education* deserves repetition here:
[I]n our present society, race is not always irrelevant to sound governmental decisionmaking. To take the most obvious example, in law

enforcement, if an undercover agent is needed to infiltrate a group suspected of ongoing criminal behavior—and if the members of the group are all of the same race—it would seem perfectly rational to employ an agent of that race rather than a member of a different racial class.
*Croson, supra*, at 512 n. 2, 109 S.Ct. at 732 n. 2.

**19.** Plaintiff's argument also appears undermined by the Supreme Court's holding in *Shaw v. Reno*, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (*"Shaw I"*). In *Shaw I*, the Supreme Court reviewed the constitutionality of a North Carolina redistricting plan. Justice O'Connor, writing for the majority, noted a "significant state interest in eradicating the effects of past racial discrimination." *Id.* at 656, 113 S.Ct. at 2831. However, she also recognized North Carolina's attempt to justify its gerrymandered majority-minority redistricting on its supposed need to comply with the federal Voting Rights Act, a "compelling interest entirely district" from an attempt to eradicate prior racial stigmatization. *Id.* at 653–54, 656, 113 S.Ct. at 2830, 2831.

"a state interest in the promotion of racial diversity has been found sufficiently 'compelling,' at least in the context of higher education, to support the use of racial considerations in furthering that interest." *Wygant, supra,* at 286, 106 S.Ct. at 1853 (O'CONNOR, J., concurring in part and concurring in judgment). She further added that, "nothing the Court has said today necessarily forecloses the possibility that the Court will find other governmental interests which have been relied upon in the lower courts but which have not been passed on here to be sufficiently 'important' or 'compelling'. . . ." *Id.*

In an attempt to buttress the *Metro Broadcasting* majority's opinion from Justice O'Connor's dissent, Justice Stevens again wrote separately to declare that, "Today the Court squarely rejects the proposition that a governmental decision that rests on a racial classification is never permissible except as a remedy for a past wrong." *Id.* at 601, 110 S.Ct. at 3028 (STEVENS, J., concurring).

In *Adarand Constructors, Inc. v. Pena,* the Supreme Court overruled the *Metro Broadcasting* opinion and held that all racial classifications, regardless of their supposedly benign motivation, are subject to strict scrutiny. *Adarand, supra,* at 269–70, 115 S.Ct. at 2133. However, the *Adarand* Court, whose opinion was authored by Justice O'Connor, did not explicitly overrule the judgment arrived at by the *Metro Broadcasting* Court. In other words, the *Adarand* Court did not decree that the FCC's form of discrimination based on diversity, not remedial action, would necessarily fail under a review of strict scrutiny.[20] Justice Stevens, with whom Justice Ginsburg joined in dissent, pointed out that:

> The majority today overrules *Metro Broadcasting* only in so far as it is "inconsistent with [the] holding" that strict scrutiny applies to "benign" racial classifications promulgated by the Federal Government. *Ante,* [at 228, 115 S.Ct.] at 2113. The proposition that fostering diversity may provide a sufficient interest

to justify such a program in not inconsistent with the Court's holding today—indeed, the question is not remotely presented in this case—and I do not take the Court's opinion to diminish that aspect of our decision in *Metro Broadcasting.*

*Id.* at 258, 115 S.Ct. at 2127–28 (STEVENS, J., dissenting).

In a final effort to convince this Court to follow the *Croson* plurality, Plaintiff urges the Court to conform its ruling to those nonmandatory decisions already reached by other Circuit Courts. See *Contractors Assoc. of Eastern Penn. v. City of Phil.,* 91 F.3d 586, 596 (3rd Cir.1996) (challenge to city's contractor set-aside program); *Hopwood v. State of Texas,* 78 F.3d 932, 944–45 (5th Cir.1996) (finding University of Texas Law School's admission policy unconstitutional), *cert. denied,* —— U.S. ——, 116 S.Ct. 2581, 135 L.Ed.2d 1095; *Podberesky v. Kirwan,* 956 F.2d 52, 55 (4th Cir.1992) (contesting university's minority scholarship program); *Milwaukee County Pavers Assoc. v. Fiedler,* 922 F.2d 419, 422 (7th Cir.1991) (challenging minority subcontractor preferences), *cert. denied,* 500 U.S. 954, 111 S.Ct. 2261, 114 L.Ed.2d 714 (1991). Plaintiff argues that this Court should be cautious of creating a conflict with other Circuits' opinions in the absence of an "abiding conviction" that those contrary holdings are unreasonable. *International Soc. for Krishna Consciousness v. Lee,* 925 F.2d 576, 580 (2nd Cir.1991), *aff'd in part,* 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (refusing to differ from a considerable weight of contrary and reasonable authority "lest the Supreme Court's ability to resolve conflicts among the circuits be impaired by the sheer number of conflicts").

Given the nature of the issues currently at hand, the Court must reject Plaintiff's suggestion that it not express a different opinion solely for the sake of easing an already overcrowded Supreme Court docket. It seems that in almost every term, the Supreme Court is forced to consider a new case with

---

**20.** Only Justice Scalia and Justice Thomas penned concurring opinions to express their view that under no circumstances can remedial measures for past discrimination justify racial discrimination. *Adarand, supra,* at 237–39, 115 S.Ct. at 2118–19 (respectively, concurring in part and concurring in judgment).

unique factual situations that altered or affected the lower court's review of a state-based racial classification. Unfortunately, this case raises many issues which prevent it from fitting neatly in line with one of the Supreme Court's prior rulings, or the other Circuit Courts' interpretations of those rulings.

The Court does not have an "abiding conviction" in the "reasonableness" of the Third, Fourth, Fifth,[21] and Seventh Circuits' judgments, all of which base their holdings on an interpretation of *Croson* previously rejected by this Court. In reliance upon the Supreme Court's affirmation that strict scrutiny is not "strict in theory, but fatal in fact," this Court cannot conclude that the only constitutional form of race-conscious decisionmaking must remedy past discrimination. *See Adarand, supra,* at 237, 115 S.Ct. at 2117 (quoting *Fullilove v. Klutznick,* 448 U.S. 448, 519, 100 S.Ct. 2758, 2795, 65 L.Ed.2d 902 (1980) (Marshall, J., concurring in judgment)).

## 2. Compelling State Interest to operate a Laboratory School

██ The defendants' interest in operating a laboratory school at UCLA to conduct research relevant to the improvement of the State's public education system through the dissemination and eventual application of such acquired knowledge is compelling. Plaintiff, on the other hand, opposes such a conclusion on the basis that this interest is too amorphous and lacks a requisite "strong basis in evidence." *Shaw v. Hunt,* —— U.S. ——, ——, 116 S.Ct. 1894, 1903, 135 L.Ed.2d 207 (1996) (*"Shaw II"*) (state institution

must prove strong basis in evidence to support remedial action); *Croson, supra,* at 497–98, 109 S.Ct. at 723–24 (plurality); *Wygant, supra,* at 276, 106 S.Ct. at 1848 (plurality) (holding that societal discrimination, without more, is too indefinite a compelling state interest for imposing a racially classified remedy).

Unlike *Bakke, Wygant, Croson, Metro Broadcasting, Shaw I, Adarand,* and *Shaw II,* this Court need not concern itself with a proffered compelling state interest of remedying the effects of past or present discrimination. Nor do the defendants assert a need to admit a multicultural student body for the sole reason that racial diversity, in and of itself, satisfies a compelling state interest. *See, e.g., Bakke, supra,* at 306–07, 315–19, 98 S.Ct. at 2757, 2761–63 (Powell, J.); *see also Croson, supra,* at 497–99, 109 S.Ct. at 723–25 (rejecting "role-model" theory of diversity). The defendants' interest in operating a laboratory elementary school is only analogous to the use of racial quotas to remedy the effects of past discrimination in that both forms of discriminatory categorization are a necessary instrumentality by which to achieve a beneficial societal goal—in this case, improved urban education. As such, the Court finds most instructive the Supreme Court's treatment of a similar argument presented by the Davis Medical School in *Bakke:* that racial set-asides were required to improve the delivery of health-care services to underserved minority communities. *Supra,* at 310–11, 98 S.Ct. at 2758–59 (rejecting this supposedly compelling state interest based on the Medical School's inability to demonstrate that its

---

21. Interestingly, in *Hopwood,* the Fifth Circuit complained that the precise scope of allowable state action with regard to racial classification remains undefined by the line of Supreme Court cases addressing this issue. For instance, the Fifth Circuit was unsure whether the Constitution permits certain forms of benign racial discrimination to correct "present effects of past discrimination." *Hopwood, supra,* at 949 n. 39 (internal quotations omitted). In addition, after having vehemently asserted that "Supreme Court decisions regarding education state that non-remedial state interests will never justify racial classifications," *id.* at 944, the Fifth Circuit noted that Justice Scalia, who rejects any use of racial sorting to remedy past discrimination, has recognized a compelling state interest to use racial

classification to avert a "social emergency." *Id.* at 945 n. 26 (quoting *Croson, supra,* at 521, 109 S.Ct. at 736 (SCALIA, J., concurring in the judgment)). While the Fifth Circuit lumped Justice Scalia's opinion with the Supreme Court's oft criticized holdings in *Kiyoshi Hirabayashi v. United States,* 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943), and *Toyosaburo Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), the Fifth Circuit only declined to consider Justice Scalia's "social emergency" compelling state interest because the issue was not presented in their particular case. *Hopwood, supra,* at 945 n. 26. That some other compelling state interest besides the provision of a remedy for past or present discrimination could exist was thus left open.

**1328**

admission policy would have a significant effect on the problem).

■ Unlike the conclusion reached by the *Bakke* Court, however, this Court believes that the defendants have carried their burdens of: (1) identifying a substantial and worthwhile need to maintain the research conducted at UES; and (2) providing a strong basis in evidence that the use of racial classifications in the UES admission policy is necessary. See *Shaw II, supra,* at —— ——, 116 S.Ct. at 1902–03 (citing Croson for the rule that in order to prove a compelling interest for implementing an affirmative action policy, the state must satisfy two conditions: (1) the identification of discrimination; and (2) the furnishing of strong evidence that racial considerations are necessary).

■ The defendants identify, and Plaintiff does not contest, a substantial state interest in maintaining and improving the public education system. The judiciary has long-recognized that a state's need to provide its citizenry with a quality education is compelling. *See Plyler v. Doe,* 457 U.S. 202, 221, 102 S.Ct. 2382, 2397, 72 L.Ed.2d 786 (1982) (recognizing "public schools as a most vital civic institution for the preservation of a democratic system of government"); *Ambach v. Norwick,* 441 U.S. 68, 76, 99 S.Ct. 1589, 1594, 60 L.Ed.2d 49 (1979) ("Public education ... fulfills a most fundamental obligation of government to its constituency.") (citation omitted); *Brown v. Board of Educ.,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954) ("[E]ducation is perhaps the most important function of state and local governments.... It is the very foundation of good citizenship.").

■ Of course, the principal purpose of the UES laboratory school is not simply to educate its own student population. As previously discussed, UES's primary mission as a program associated with the UCLA GSE & IS is to conduct research and disseminate information regarding potential innovations in urban elementary educational methods. The UES Information On Admissions For

Fall, 1995 [22] describes the school's function as follows:

> The Corinne A. Seeds University Elementary School (UES) is a laboratory of the UCLA Graduate School of Education and Information Studies. As a laboratory school, its primary functions are research on effective educational strategies and dissemination of new knowledge about educational practice to teachers and administrators throughout the state and nation.... Seeds UES is also a center for the education and training of teachers and educational leaders.

In addition, all UES applicant's parents are instructed and voluntary accept the fact that some of the studies undertaken by UES researchers may not enure to the particular benefit of their own children. The UES consent form [23] informs potential parents that:

> The Seeds University Elementary School serves, in its central function, as an official University laboratory for research and inquiry in education. In seeking admission of your child to the University Elementary School, you express your acceptance of the fact that your child, if admitted, will be enrolled in an experimental school, in which teaching methods, curriculum, school organization, and children's learning and development will be continually under study. In addition, you express your understanding and acceptance of the risk that, while these studies are carefully designed in the search for improved educational understanding and practice, ... these studies may or may not yield specific benefit to your child.

Strong evidence exists that for UES to carry out its research mission, it must be permitted to admit a student population that presents similar issues and challenges that arise in the ethnically diverse student population now present in the urban school community. An unexhaustive list of such issues and challenges includes limited language proficiency, different learning styles, involvement of parents from diverse cultures with different ex-

**22.** Plaintiff's Exh. 1.

**23.** Defs.' Exh. 127.

pectations and values, and racial and ethnic conflict among families and children.[24]

The Court simply cannot hope to recount each of the particular innovative educational techniques developed at UES, or each of the specific studies conducted at UES, which rely on the diversity of the laboratory school's student population.[25] Having examined the testimony of the defendants' witnesses, the Court is convinced that without a racially and ethnically diverse student population, the benefits to be gained by these innovations and studies would be lost. The defendants' practical purpose of operating a laboratory school (the actual improvement of the State's urban education system) would be further jeopardized by a marked decrease in the credibility of future studies conducted at UES should the school fail to maintain a student population reflective of the urban environment.[26]

Furthermore, the Court concludes that strong evidence exists that the research performed at UCLA will help effectuate mean-ingful change in urban elementary schooling. During trial, the Court heard from a parade of experts about the necessity of a race-conscious admission policy at UES. Each expert's testimony was underscored by the belief that the State must "continue to conduct research on issues involving how children learn and how we can do a better job of teaching them." Handler Direct, ¶ 3, at 3:5–7. Given the nature of problems currently plaguing the urban public school system, especially in the Los Angeles Unified School District, it would be presumptuous to assume that the State already possessed the answers to all of the complex questions about teaching and learning methods. *Id.* at 3:13–26. As the only publicly-funded laboratory school in California, UES plays an integral part in the State's search for ways to improve the quality of urban education.

▇ Finally, contrary to Plaintiff's beliefs, the defendants should not be required to prove that the specific forms of research conducted at UES will guarantee improve-

24. *E.g.* Direct Testimony of Dean Mitchell, ¶ 10, at 6:23–7:5 [hereinafter "Mitchell Direct," etc.]; Handler Direct, ¶ 3, at 19–26 (Ph.D. in Educational Psychology from the University of Southern California, and currently Adjunct Professor and Special Assistant to the GSE & IS Dean).

For the sake of convenience, the parties presented their direct testimony in the form of narrative statements and deposition transcripts. During trial, the parties were afforded an opportunity to cross-examine and re-direct the witnesses. The Court also considered each parties' objections, the vast majority of which were filed by Plaintiff, to the opposing parties' narrative testimony and exhibits. For the sake of brevity, and unless otherwise noted, the Court overrules these objections. Suffice it to say that almost all of Plaintiff's objections related to foundation or form, and exposed nothing more than procedural defects which were cured during trial or by the Court's acceptance of the defendants' witnesses as experts in their respective fields.

25. *See, e.g.*, Megan Franke Direct, ¶¶ 4–6, at 3:10–4:25 (Ph.D. in Educational Psychology from the University of Wisconsin, Madison; Assistant Professor at GSE & IS) (mathematics oriented research); Jeffrey Nelson Direct, ¶ 5, at 3:13–17 (Ph.D. in Educational Administration from the University of California at Santa Barbara; current Director of the New England School Management Program and member of National Faculty of UCLA's School Management Program) (describing attempts to establish a net-work between UES and the Los Angeles Unified School District's LEARN program); Geoffrey Saxe Direct, ¶¶ 7–8; at 4:1–5:8 (Ph.D. in Developmental Psychology from the University of California, Berkeley; former Chair of the Research Committee at UCLA's Urban Education Study Center; current Professor at GSE & IS) (describing two studies on the effects of California's implementation of a new mathematics curricula); Ronald Gallimore Direct, ¶ 10, at 6:20–7:8:2 (Ph.D. in Psychology from Northwestern University; former founder of the University of Hawaii laboratory school, Bishops Estate; current UCLA professor) (describing peer leadership research conducted at UES). *See also* Defs.' Exhs. 106 (Urban Education Studies Center Report, June, 1995, at 7–24), 107 (same, 1995–96, at 6–19), 110–12 (Connections, UES publication), & 118 (grant proposal for early childhood bilingual program).

26. Handler Direct, ¶ 9–10, at 8:5–9:11 ("Appropriate ethnic and racial diversity, as well as diversity within income groups, is also essential if the results of the laboratory school's research are to be effectively disseminated to the public schools."); Stipek Direct, ¶¶ 27–28, at 18:17–23:15 ("To provide a 'real world' setting in which new educational practices can be disseminated effectively, UES must have a population of children and families that reflects the diversity of California's urban public schools. Otherwise, what we do at UES has no credibility."). *See also* Defs.' Exh. 117 (list of outside visitors to UES during 1995–96 school year).

ments in the public education system. Endemic to all research is the possibility that actual results may not correspond with desired outcomes. But the chance that a particular study may yield disappointing results does not defeat the importance of a state's continued research to uncover potential solutions to societal crises. The need for research, despite its inherent uncertainty, is what distinguishes the instant situation from the *Bakke* Court's refusal to conclude that the Davis Medical School had proved a sufficient nexus between reserved minority admission slots and an improvement in minority health care. *Bakke, supra,* at 310–11, 98 S.Ct. at 2758–59. In this case, the defendants provide a strong basis in evidence that continued research will lead to a greater understanding of the complex issues surrounding California's urban elementary school system [27]—even if the defendants cannot guarantee an improvement from the results of each individual study.

### D. Narrow–Tailoring

 Strict scrutiny review requires an analysis of not only the government's purpose or goal, but also the means by which that purpose is sought to be obtained. *Adarand, supra,* at 237, 115 S.Ct. at 2117 ("When race-based action is necessary to further a compelling interest, such action is within constitutional constraints if it satisfies the 'narrow tailoring' test."). The narrow tailoring requirement mandates that a State implement its legitimate purpose "by means that do not impose disproportionate harm on the interests, or unnecessarily trammel the rights, of innocent individuals directly and adversely affected by a plan's racial preference." *Wygant, supra,* at 287, 106 S.Ct. at 1854 (O'CONNOR, J., concurring). Although the Supreme Court has "not always provided precise guidance on how closely the means (the racial classification) must serve the end (the justification or compelling interest), [it has] always expected that the legisla-

tive action would substantially address, if not achieve, the avowed purpose." *Shaw II, supra,* at ——, 116 S.Ct. at 1905.

 Plaintiff's primary attack on the narrow tailoring of UES's admission policy focuses on the defendants' supposed failure to consider available alternatives to the use of racial and ethnic criteria. Plaintiff asserts that the defendants could achieve the same diverse student population by random sampling or the use of a socio-economic criterion instead of race or ethnic identity. Plaintiff also suggests that UES could obtain an increased number of minority applicants through an outreach program, and that UES's studies could just as effectively be performed in the urban public schools in which the research techniques will eventually be implemented. For the following reasons, the Court rejects Plaintiff's arguments.

First, the Court believes it would not be possible, nor would it be reasonable, to require the defendants to attempt to obtain an ethnically diverse representative sample of students without the use of specific racial targets and classifications. The Court's feelings are perhaps best summarized by Professor Carollee Howes of the GSE & IS:

> There is a simple rule about being a researcher. You ask a simple question. If you're trying to find a sample that has some distribution of race, you use race as the variable to make that. You don't use an approximation or some variable of it.[28]

Random sampling and a socio-economic criterion do not provide an adequate substitute for the use of racial and ethnic identity factors. For instance, despite its concerted effort to increase minority applicants through an outreach program, UES still does not obtain enough hispanic or Latino applicants to match the percentage of those students currently represented in California's urban elementary schools (37%).[29] Therefore,

---

**27.** *See supra* note 25 (listing examples of specific studies which provide evidentiary nexus between UES and improvements in California's educational system).

**28.** Howes Direct, at 44:4–8 (Masters in Child Study from Tufts University; Ph.D. in Develop-

mental Psychology from Boston University; postdoctoral training in social psychiatry at Harvard University).

**29.** However, as should be evident from the Court's prior reasoning, UES would not be required to admit 37% hispanics simply because

these alternative admission procedures cannot necessarily ensure the sample student population required by UES's team of researchers.

Second, despite the fact that UES's racial targets are derived from the percentages of ethnic minorities in California's public schools,[30] it would not be reasonable to expect that the percentages of UES minority admittees should exactly correlate with these State gathered statistics. In reality, the number of students actually admitted into UES's EC–1 class is fairly small, only 46 students. Therefore, each child constitutes over two-percent of the total number of admitted students.[31] The Court need not apply Solomonic wisdom to recognize that UES may not "cut its child-applicants in half" for the purpose of exactly matching its percentage of minority admittees with the percentages of minorities present throughout California's urban schools.

Third, UES's inability to mirror a "typical" urban school does not undermine the State's compelling interest to conduct research oriented towards improving urban education. The Court questions Plaintiff's contention that UES, in attempting to create a racially diverse research population, must strive to have its percentages of minority admittees reflect a "typical" California urban school. While the Court has already expressed its belief that UES's credibility to effectively disseminate and implement its innovative educational techniques is dependent upon its diverse student population, the Court is hard-pressed to image a "typical" urban school upon which UES could mirror its admissions. In fact, the Court's concern was best expressed by Gina Brandt, Plaintiff's mother, former President of the UES Family School Alliance ("FSA"). In a 1990 FSA memorandum to Ms. Carlotta Mellon, Assistant Vice Chancellor of UCLA, regarding UCLA's reasons for its proposed relocation of UES,[32] Brandt wrote:

> The larger questions here, however, are whether such a thing as a "typical" setting exists, and whether such a "typical" setting—if it does exist—is appropriate for a laboratory school. What is a "typical" urban elementary school in the United States today? New immigrants and new mobility make schools today unlike anything known before, where no place is typical of the whole. The demographics of California and the West are dramatically different from the rest of the nation. Therefore, to suggest that UES is not "typical" begs the question of whether California is "typical." What is a "typical" school in Los Angeles? Increasingly, it is a school where no one ethnic group is a majority, where sixteen native languages and dialects may be spoken, and where the demographic profile of this year's students may be radically different from next year's enrollees. Change is the only constant. Research in this context will require maximum flexibility in the structuring of the research design and of the research population. For a laboratory school to be bridled by one neighborhood's patterns of growth and change, in a community that is atypical by anyone's standards, would undercut that very flexibility.

this is the number represented throughout California's schools. The actual percentage of hispanic applicants could be modified by the UES Admissions Committee to substantially serve the needs of the school's research purposes. *See Shaw II, supra,* at ——, 116 S.Ct. at 1905.

**30.** Raymond Lipp, III Direct, at 85:24–86:2 (UES Director of Admissions and Assistant Director of Development).

**31.** *See* Stipek Direct, ¶ 41(c), at 31:20–32:4 (describing relation of a 10% "critical mass" of each racial classification to actual percentages of minority students admitted). "The kind of variable sociological and political analysis necessary to

produce such rankings simply does not lie within the judicial competence...." *Bakke, supra,* at 297, 98 S.Ct. at 2751–52 (Powell, J.). *See also supra* note 15 (acknowledging the Supreme Court's cautionary advice that the judiciary should afford great deference to research decisions protected by academic freedom and the First Amendment).

**32.** Defs.' Exh. 103, at 3. Plaintiff's objections to the introduction of this document are overruled in so far as the document has probative value to the issue of narrow-tailoring of the UES admission policy. The document is not considered for reasons of estoppel against either Plaintiff or Brandt.

Finally, the race and ethnicity-oriented research conducted at UES could not otherwise be performed in the actual urban elementary schools in which the resultant educational techniques may someday be implemented. UES provides a controlled environment where teachers and researchers can control class-size, age groupings among classes, student-teacher ratios, parental influence, and other variables which may affect the credibility of such experiments. Mitchell Direct, ¶¶ 7–8, at 10–27; Handler Direct, ¶ 6, at 5:12–7:5; Gallimore Direct, ¶¶ 8–9, at 5:21–6:18 (specifically describing inability to conduct studies in public schools because of attrition of teachers and school support). A significant inhibitor to the researchers' ability to conduct their experiments directly in the urban public schools is their inability to guarantee needed parental involvement. Because so much of a child's learning is impacted by his or her home life, parents of UES children agree, as an enrollment condition, that they themselves will necessarily become involved in the research. Public schools lack this unique feature of great scientific importance. *See, e.g.,* Handler Direct, ¶ 6(a), at 5:20–6:4 (In public schools, "[y]ou can request cooperation, and you certainly will have some parents who do volunteer. However, you cannot require that parents do a host of things in relationship to their children's education external to what is going on in school itself. As a result, depending on voluntary participation by parents produces additional bias in the study being undertaken through the self-selection involved in volunteering.")

The defendants are not required under the narrow-tailoring doctrine to defend their use of racial and ethnic considerations against all hypothetical alternatives. Rather, the defendants have successfully met the challenge of proving that UES's race-conscious admission policy serves a compelling state interest without "unnecessarily trammeling" Plaintiff's right to equal protection under the law. *Wygant, supra.*

## V. CONCLUSION AND ORDER

The defendants have successfully proven that the use of racial and ethnic identity criteria in UES's admission policy is narrow-ly tailored to serve the purpose of a compelling state interest. Based on the foregoing findings of fact and conclusions of law, the Court hereby ORDERS as follows:

1. Judgment shall be entered for defendants the Regents and Dean Mitchell;

2. Plaintiff shall take nothing in the form of damages or costs in her suit against the defendants;

3. The preliminary injunction entered by the Court on September 18, 1995, requiring Plaintiff's admission to UES is VACATED;

4. The defendants are entitled to costs as taxed by the Clerk of the Court.

IT IS SO ORDERED.